UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCCUPATIONAL SAFETY & HEALTH LAW PROJECT, PLLC, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR, <br><br> *Defendant*, <br><br> and <br><br> CENTURY ALUMINUM COMPANY, <br><br> *Intervenor.* | Civil Action No. 21-2028 (RCL) |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT[1]**

Dated: March 25, 2022

Respectfully submitted,

Baruch A. Fellner
D.C. Bar #061630
BFellner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., NW
Washington, DC
Telephone: 202-955-8591

*Attorney for Century Aluminum Company*

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: */s/ Anna D. Walker*
ANNA D. WALKER
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
202-252-5244
anna.walker@usdoj.gov

*Attorneys for the United States of America*

---

[1]     Please take notice that Century Aluminum Company hereby joins in Defendant U.S. Department of Labor's response and reply brief.

**TABLE OF CONTENTS**

ARGUMENT.................................................................................................................................. 1

I.    DOL'S STATEMENT OF UNDISPUTED MATERIAL FACTS SHOULD BE
LARGELY DEEMED ADMITTED. ................................................................................. 2

II.   DOL PROPERLY WITHHELD FOIA EXEMPTION 4 INFORMATION. .................... 6

   A.    The Record Shows That All Information Withheld Under Exemption 4 Was
   "Obtained From a Person." ................................................................................... 6

   B.    The Record Establishes That the Information DOL Withheld Under Exemption 4 is
   Commercial Information. ..................................................................................... 10

   C.    The Record Shows That All Information DOL Withheld is Confidential. ................ 14

      1.    DOL has met its burden of proof to show that all withheld information is
      customarily and actually treated as confidential. .............................................. 15

      2.    The Abatement Plan is not a variance, or a settlement agreement that is regularly
      publicized on OSHA's website. .......................................................................... 20

      3.    There is no obligation that requires written exposure control plans to be made
      publicly available and Century regularly keeps such plans confidential. ........................ 21

      4.    The record shows that DOL assured Century that it would maintain the withheld
      information in the Abatement Plan as confidential. .......................................................... 22

III.  DOL HAS MET ITS BURDEN IN SHOWING FORESEEABLE HARM. .................. 25

IV.   DOL RELEASED ALL REASONABLY SEGREGABLE INFORMATION............. 29

CONCLUSION............................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*100Reporters LLC v. United States Dep't of Just.*,
    248 F. Supp. 3d 115 (D.D.C. 2017) ................................................................. 11, 26

*Abdelkarim v. Tomlinson*,
    605 F. Supp. 2d 116 (D.D.C. 2009) ...................................................................... 3

*Armstrong v. Exec. Off. of the President*,
    97 F.3d 575 (D.C. Cir. 1996) ............................................................................... 29

*Baker & Hostetler LLP v. Dep't of Commerce*,
    473 F.3d 312 (D.C. Cir. 2006) ........................................................................ 13, 14

*Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*,
    601 F.3d 143 (2d Cir. 2010) .................................................................................. 9

*Canning v. Dep't of Justice*,
    567 F. Supp. 2d 104 (D.D.C. 2008) ..................................................................... 29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................. 3

*CIA v. Sims*,
    471 U.S. 159 (1985) ............................................................................................ 19

*Citizens for Responsibility & Ethics in Washington v. Dep't of Commerce*,
    No. 18-3022, 2020 WL 4732095 (D.D.C. Aug. 14, 2020) ............................... 22–25

*Cooper v. District of Columbia*,
    279 F. Supp. 3d 156 (D.D.C. 2017) ....................................................................... 4

*Cornucopia Inst. v. Dep't of Agric.*,
    Civ. A. No. 16-148 (RC), 2018 WL 4637004 (D.D.C. Sept. 27, 2018) ................. 12

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
    436 F. Supp. 3d 90 (D.D.C. 2019) ............................................... 15, 22, 25, 26, 29

*Ctr. for Investigative Reporting v. Dep't of Labor*,
    470 F. Supp. 3d 1096 (N.D. Cal. 2020) ............................................................... 25

*Ctr. for Nat'l Security Studies v. U.S. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ............................................................................. 19

*Edmonds v. U.S. Dep't of Just.*,
 405 F. Supp. 2d 23 (D.D.C. 2005) ................................................................................. 19

*Elec. Priv. Info. Ctr. v. DHS*,
 117 F. Supp. 3d 46 (D.D.C. 2015) ................................................................................. 14

*Fisher v. Renegotiation Board*,
 355 F. Supp. 1171 (D.D.C. 1973) ................................................................................. 10

*Food Mrktg. Inst. v. Argus Leader Media (FMI)*,
 139 S. Ct. 2356 (2019) ................................................................................ 9, 14, 15, 23

*Detention Watch Network v. ICE*,
 215 F. Supp. 3d 256 (S.D.N.Y. 2016) .......................................................................... 10

*Forest Cnty. Potawatomi Cmty. v. Zinke*,
 278 F. Supp. 3d 181 (D.D.C. 2017) .............................................................................. 14

*Gellman v. Dep't of Homeland Sec.*,
 Civ. A. No. 16-0635 (CRC), 2020 WL 1323896 (D.D.C. Mar. 20, 2020) .............................. 23

*Judicial Watch, Inc. v. Export–Import Bank*,
 108 F. Supp. 2d 19 (D.D.C. 2000) ............................................................................. 8, 10

*Kahn v. Fed. Motor Carrier Safety Admin.*,
 648 F. Supp. 2d 31 (D.D.C. 2009) ........................................................................... 11, 14

*Leopold v. Dep't of Just.*,
 Civ. A. No. CV 19-3192 (RC), 2021 WL 124489 (D.D.C. Jan. 13, 2021) ...................... 12, 27

*Majuc v. Dep't of Just.*,
 Civ. A. No. 18-CV-566 (APM), 2022 WL 266700 (D.D.C. Jan. 28, 2022) ......................... 12

*New York Times Co. v. Dept' of Just.*,
 Civ. A. No. 19-1424, 2021 WL 371784 at *12 (S.D.N.Y. Feb. 3, 2021) ............................. 13

*People for the Ethical Treatment of Animals v. Dep't of Health & Human Serv.* (*PETA*),
 901 F.3d 343 (D.C. Cir. 2018)................................................................................. 14, 15, 27

*Philadelphia Newspapers, Inc. v. Dep't of Health & Hum. Servs.*,
 69 F. Supp. 2d 63 (D.D.C. 1999) ................................................................................. 10

*Pub. Citizen Health Rsch. Grp. v. Nat'l Institutes of Health (Pub. Citizen I)*,
 209 F. Supp. 2d 37 (D.D.C. 2002) ................................................................................. 8

*Pub. Citizen v. Dep't of Health & Hum. Servs. (Pub. Citizen III)*,
 66 F. Supp. 3d 196 (D.D.C. 2014) ................................................................... 12, 28

*Pub. Citizen v. United States Dep't of Health & Hum. Servs. (Pub. Citizen II)*,
 975 F. Supp. 2d 81 (D.D.C. 2013) ........................................................................ 11

*Renewable Fuels Ass'n v. EPA*,
 519 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................... 22, 23

*Renewable Fuels Ass'n v. United States Env't Prot. Agency*,
 Civ. A. No. 18-2031 (JEB), 2021 WL 602913 (D.D.C. Feb. 16, 2021) ................................. 15

*Rocha v. Brown & Gould, LLP*,
 101 F. Supp. 3d 52 (D.D.C. 2015) ....................................................................... 3-4

*S. All. for Clean Energy v. Dep't of Energy*,
 853 F. Supp. 2d 60 (D.D.C. 2012) ......................................................................... 7

*SEC v. Banner Fund Int'l*,
 211 F.3d 602 (D.C. Cir. 2000) ............................................................................. 3

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr. Inc.*,
 191 F. Supp. 3d 13 (D.D.C. 2016) ......................................................................... 5

*Shapiro v. Dep't of Just.*,
 Civ. A. No. 12-0313 (BAH), 2020 WL 3615511 at *26 (July 2, 2020) ............................ 15, 23

*Sussman v. U.S. Marshals Serv.*,
 494 F.3d 1106 (D.C. Cir. 2007) ....................................................................... 29, 30

*Twist v. Meese*,
 854 F.2d 1421 (D.C. Cir. 1988) ......................................................................... 2, 3

**Statutes**

5 U.S.C. § 552 ............................................................................... 1, 2, 6, 13, 29
29 U.S.C. § 655 ............................................................................................. 20
29 U.S.C. § 660 ......................................................................................... 27, 29
section 6 ................................................................................................... 44

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 3
Fed. R. Evid. 408 ........................................................................................... 5

v

Fed. R. Evid. 701 ........................................................................................................ 5, 6

LCvR 7(h) ....................................................................................................................... 2, 3

Fed. R. Civ. P. 56 ........................................................................................................... 3

**Other**

29 C.F.R. § 1910.1020 ................................................................................................... 22

29 C.F.R. § 70.26 .......................................................................................................... 24

29 C.F.R. § 1910.1024 ................................................................................................... 22

Undersigned counsel, on behalf of Defendant, the U.S. Department of Labor ("DOL"), respectfully submits this Reply in Support of its Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment. DOL previously demonstrated in its Motion for Summary Judgment that it properly withheld information under Exemption 4 of the Freedom of Information Act ("FOIA") and released all reasonably segregable information to Plaintiff. As discussed more fully below, Plaintiff's Cross-Motion and Opposition provides no basis to conclude otherwise and thus should be denied and DOL's motion should be granted.

## ARGUMENT

Plaintiff's response opposing the DOL's motion for summary judgment and memorandum supporting its cross-motion for summary judgment ("Plaintiff's response") argues that DOL unlawfully withheld information contained in Century Aluminum Company's ("Century" or "Century Aluminum") Abatement Plan (or "Plan") under FOIA Exemption 4. This information, however, which contains highly sensitive calculated solutions to effectively reduce beryllium exposure at Century's aluminum facilities at the lowest feasible cost, *see* Declaration of Dennis Harbath, ECF No. 17-4 ("Harbath Decl.") ¶ 14; Pl's Resp. to Def's Stmt. of Material Facts, ECF No. 22 ("Pl's Resp. SMF) ¶¶ 5–6, 29, is the very type of confidential commercial information which FOIA Exemption 4 requires DOL to protect from disclosure. 5 U.S.C. § 552(b)(4). As a carefully crafted playbook, this plan details how Century's aluminum facilities can maintain compliance with OSHA's Beryllium standard while safeguarding production and profitability, in a highly competitive industry, the disclosure of which would certainly amount to a windfall for Century's competitors, at a substantial financial loss to Century itself. *See* Harbath Decl. ¶¶ 13, 16–17; Declaration of Stanley E. Keen, ECF No. 17-3 ("Keen Decl.") ¶¶ 18, 20–21; Pl's Resp. SMF ¶¶ 25–25, 29, 31. Plaintiff, nevertheless, argues that such information developed by Century

was not obtained from a "person," and is neither commercial nor confidential to warrant protection under FOIA Exemption 4. But the clear record in this case proves Plaintiff incorrect. Not only did DOL correctly assess and withhold Century's highly sensitive, capital intensive, business "playbook," which is commercial information that Century keeps closely held to protect its value, but DOL also abided by the principles of segregability and foreseeability under FOIA when responding to Plaintiff's FOIA request. *See* 5 U.S.C. § 552(a)(8)(A).

## I.   DOL'S STATEMENT OF UNDISPUTED MATERIAL FACTS SHOULD BE LARGELY DEEMED ADMITTED.

As an initial matter, when evaluating the facts of this case, the Court should accept a large number of DOL's statement of facts, purportedly in dispute, as true because Plaintiff's response opposing these facts does not comply with Local Rule 7(h) and Federal Rules of Civil Procedure ("Rules") 56(d) and (e). Specifically, Plaintiff's responses to DOL's statement of material facts contained in paragraphs 19, 23, 26–31 misconstrue facts to create disputes that do not exist, include additional facts that do not contest the statements at issue, and attempt to dispute material facts with inadmissible lay opinions and legal arguments rather than evidence from the record. *See* Pl's Resp. SMF ¶¶ 19, 23, 26–31.

Local Rule 7(h) requires "[e]ach motion for summary judgment . . . be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue." LCvR 7(h). Thereafter, any "opposition to such a motion [must also] be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended [that] a genuine issue [exists] . . . to be litigated[.]" *Id.* The responding statement of genuine issues must "reference . . . the parts of the record relied on to support the statement." *Id.* Courts in this district require "strict compliance" this rule, *see Twist v. Meese*, 854 F.2d 1421, 1424 (D.C. Cir. 1988) (quoting *Gardels v. Cent. Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980)). Thus, "[i]n

2

determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is [properly] controverted in the statement of genuine issues filed in opposition to the motion." *Id.*; *see SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000).

The requirements of Local Rule 7(h)(1) are also consistent with the requirements of Rule 56(c) and Rule 56(e) under these Federal Rules of Civil Procedure ("Rules"), the former of which states that:

> [a] party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may. . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Thus, when a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial and support such facts with competent evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Abdelkarim v. Tomlinson*, 605 F. Supp. 2d 116, 119 (D.D.C. 2009) ("Accepting . . . conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.").

This Court may deem DOL's Statement of Material Facts in paragraph 19 as admitted because Plaintiff's response to it misconstrues the evidence on which it relies to create a dispute that does not exist. *See Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 58 n.3 (D.D.C. 2015) (examining the record and finding that the non-movant's objection to a fact misconstrues the

evidence on which it relies and does not, therefore, contradict the evidence.). Specifically, the material fact states that "the Abatement Plan contains an express provision designating all items discussed therein as confidential commercial information." *See* Def's SMF, ECF No. 17-2 ¶ 19. Plaintiff disputes this fact, because the express provision at issue also states that "Century designates" the information included in the Abatement Plan as confidential commercial information. *See* Pl's Resp. SMF ¶ 19. This qualifier, however, does not change the fact that the express provision, qualified or not, is still contained in the Abatement Plan.

Plaintiff's response to paragraph 23 is also insufficient to demonstrate a genuine issue of material facts because it includes additional and immaterial facts in its response to create the illusion of a dispute that does not exist. *See Cooper v. District of Columbia*, 279 F. Supp. 3d 156, 159 (D.D.C. 2017) ("[A] material fact in the movant's statement is not 'controverted' if a non-movant supplies additional facts and 'factual context' but does not actually dispute the movant's asserted fact.") (quotations omitted). Specifically, paragraph 23 recites the steps Century took to maintain the draft Abatement Plan as confidential, including requiring United Steelworkers to agree to keep it confidential for settlement purposes only. *See* Def's SMF ¶ 23. In response, Plaintiff claims separately that *OSHA* disclosed a separate draft of the Abatement Plan to United Steelworkers' counsel without any restrictions. *See* Pl's Resp. SMF ¶ 23. Allegations, however, regarding OSHA's actions are immaterial to facts about how Century handled the draft Abatement Plan it provided to United Steelworkers. Suggesting that the disclosure refutes the confidential treatment of the information is also disingenuous given the fact that OSHA did not provide the draft abatement plan in full. Rather, it conferred first with Century and released only parts of the plan that related to Century's plants in Kentucky as United Steelworkers did not represent workers at Century's South Carolina facility. *See* Declaration of Edmund C. Baird ("Baird Decl.") ¶ 8, Ex.

4

3. Moreover, United Steelworkers, which intervened in support of OSHA, understood that the draft was only being provided because of the critical role United Steelworkers played in resolving the litigation. *See* Harbath Decl. ¶ 31; Plf.'s Mem., ECF No. 22 at 14. Thus, it was provided access to the draft Abatement Plan for settlement purposes only, which sharply limits the disclosure of the document.  *See* Baird Decl. ¶¶ 5, 9; *cf.* Fed. R. Evid. 408.

Nonetheless, in further responding to paragraph 23, Plaintiff next argues semantics over the fact that Century did not expressly tell United Steelworker's *counsel* to keep drafts of the Abatement Plan confidential. *See* Pl's Resp. SMF ¶ 23. But this "additional fact," is again, a red herring that does not establish a genuine dispute about the confidential treatment because counsel's client, United Steelworkers, itself assured Century that it would keep drafts of the Abatement Plan confidential and by extension, its counsel was required to do the same. *See* Def's Resp. SMF ¶¶ 36, 38; *See* Harbath Decl. ¶ 31 & Attch. A.

The rest of Plaintiff's response to paragraph 23, along with Plaintiff's responses to paragraphs 26–31 in DOL's statements of material fact, concede the facts in these paragraphs because Plaintiff's responses contain what appears to be vague and inadmissible lay opinions and legal argument. *See* Fed. R. Evid. 701(c); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr. Inc.*, 191 F. Supp. 3d 13, 14 n.1 (D.D.C. 2016) (finding that a non-movant's response to statement of facts that contain inadmissible expert legal arguments in paragraph form, and which fail to cite to any evidence in the record, concede that there are not genuine disputes with respect to those facts). For example, DOL's paragraph 26 relies on Mr. Harbath's affidavit to support the fact that Century has no access to its competitor's engineering and work practices that limit worker exposure to beryllium, and that it also does not share its own practices with competitors. *See* Def's SMF ¶ 26. In an attempt to dispute this supported fact,

Plaintiff cites to an attorney declaration that widely speculates about certain engineering and work practices that are routinely used in the industry and publicly available. *See* Pl's Resp. SMF ¶ 26. Because this vague conclusory statement neither contests the fact to which it purports to dispute, nor helps to clarify a determination of a factual issue, it bumps against what appears to be improper lay opinion testimony and should be disregarded. *See* Fed. R. Evid. 701(b). Plaintiff's remaining responses to statements of fact contained in paragraphs 27–31 fair no better. The majority of these responses merely repeat legal arguments included in an attorney declaration, *see* Pl's Resp. SMF ¶¶ 27, 29, 30, or repeat legal arguments that are contained in Plaintiff's supporting memorandum. *See id.* ¶¶ 28, 30, 31. Neither source constitutes evidence in the record. Thus, DOL's statements of fact should be deemed largely admitted.

## II.   DOL PROPERLY WITHHELD FOIA EXEMPTION 4 INFORMATION.

As previously mentioned DOL properly withheld information under Exemption 4, which protects from disclosure "trade secrets and commercial or financial information obtained from a person and privilege or confidential." 5 U.S.C. § 552(b)(4). Plaintiff begins by alleging that information contained in Century's Abatement Plan was not "obtained from a person" and does not constitute commercial nor confidential information. Each of these arguments fails on the face of the record.

### A.   The Record Shows That All Information Withheld Under Exemption 4 Was "Obtained From a Person."

Plaintiff does not dispute that Century is a "person" within the meaning of Exemption 4. *See* Pl's Mem. at 11. Rather, Plaintiff alleges that information in the Abatement Plan was not obtained *from* Century because that information was added to a negotiated settlement agreement between Century and OSHA. However, the purpose of Exemption 4 is to shield from disclosure the confidential information that persons may submit to the government. Accordingly, even

6

"information in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information." *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (citing *Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979)). Although the distinction between information obtained from outside the government agency, rather than inside the government agency, can be blurry, the record in this case clearly shows that information in the Abatement Plan was obtained from Century. In addition, Plaintiff's sole reliance on the fact that the Abatement Plan was part of a negotiated settlement between OSHA and Century, without more is not enough to exclude it from Exemption 4 protections. *See S. Alliance for Clean Energy*, 853 F. Supp. 2d at 69 (holding that the mere fact that information was negotiated does automatically "preclude the proper application of Exemption 4."). Rather, the key factor for determining whether negotiated information is protected is whether the information is either "slightly modified by the agency" or is "substantially reformulated by the agency, such that it is no longer a 'person's' information but the agency's information." *See id.* Only the former is shielded by Exemption 4. To determine which camp information falls under, this Court look to the record in the case. *See id.*

Nothing in the record suggests that the Abatement Plan contained in OSHA and Century's settlement agreement to resolve Century's petition over changes to the Beryllium standard, was "substantially reformulated" by OSHA, let alone even slightly modified. It is undisputed that Century, not OSHA, spent "significant resources to develop [this Plan] . . . in a way that could ensure compliance with OSHA's Beryllium standard." *Id.* ¶ 20; Harbath Decl. ¶¶ 12, 16; *see also* Pl's Resp. SMF ¶ 27; *infra*, Sec. I.

Plaintiff alleges that the Plan reflects "OSHA's decisions, based on its own analysis of the adequacy of Century's proposed abatement plan[], regarding the developed terms by which

7

Century would satisfy the Beryllium standard." *See* Pl's Mem. at 13–14. But Plaintiff cites no support for these allegations in the record. To the contrary, the terms of the Abatement Plan, speak for themselves in proving that OSHA's hand in developing this Plan was minimal at most. Specifically, the Plan provides that OSHA only "*reviewed*" the detailed submissions provided by Century regarding airborne exposure to beryllium and representations that Century made to maintain those levels within the acceptable range and that "[i]n light of the foregoing statements *by Century*, . . . OSHA has determined that compliance with the terms of the Abatement Plan[] . . . would satisfy Century's obligations with respect to [certain provisions] of the Beryllium standard." Keen Decl., Ex. 2 (emphasis added); Def's Resp. SMF ¶ 59. But even if OSHA's review had prompted Century to refine its abatement procedures, both the original and the revised versions would still remain confidential commercial information. *Pub. Citizen Health Rsch. Grp. v. Nat'l Institutes of Health (Pub. Citizen I)*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("Documents that contain "summaries or reformulations of information supplied by a source outside of the government" are protected under exemption 4.")

Plaintiff, instead, seems to rely solely on the fact that because the Abatement Plan was part of a settlement agreement, it cannot qualify as materials obtained from a person. *See* Pl's Mem. at 13–14. Without more, however, courts in this district have squarely rejected this argument. *Judicial Watch, Inc. v. Export–Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (holding that documents that contain "summaries or reformulations of information supplied by a source outside of the government" are protected under exemption 4); *Pub. Citizen I*, 209 F. Supp. 2d at 44 (rejecting the proposition that information cannot be considered to have been submitted to the government when the information was generated in negotiations). And that accords with the Supreme Court's repeated instruction to apply FOIA as it is written, including the ordinary

meaning of "confidential" not requiring extraordinary secrecy measures but rather customary care entirely consistent with operating a regulated business and cooperating with government safety experts. *See Food Mrktg. Inst. v. Argus Leader Media* (*FMI*), 139 S. Ct. 2356, 2364 (2019).

Plaintiff next seems to argue that without OSHA's involvement, the redacted information in the Abatement Plan would not exist. *See* Pl's Mem. at 15–16. This, again, is unsupported by competent evidence in the record. To the contrary, the undisputed facts establish that it is common practice for aluminum producers, like Century, to develop and maintain efficient and effective beryllium control measures in order to stay competitive, profitable, and compliant with OSHA regulations. *See* Pl's Resp. SMF ¶¶ 6, 24–25, 29; *infra*, Sec. I. Accordingly, while the Abatement Plan contains a series of "engineering and work practice controls to reduce and maintain employee airborne exposure to beryllium below OSHA's Beryllium standard" the Abatement Plan was not the catalyst driving Century's development of the measures contained within the Plan to reduce beryllium exposure efficiently and effectively. *See* Pl's Resp. SMF ¶ 6.

Plaintiff tries to analogize information in the Abatement Plan to two cases from the Second Circuit, neither of which is controlling and both of which are distinguishable. In *Bloomberg L.P. v. Board of Governors of the Fed. Reserve Sys.*, 601 F.3d 143 (2d Cir. 2010), the Second Circuit held that information contained in loans generated by the Federal Reserve Banks, were not protected under Exemption 4, even though information inside the loans came from the applicant, because the loans were generated by the agency. *Id.* at 148–49. The Court also noted that the FOIA request sought documents showing what loans the Federal Reserve Banks actually made, not information about the loan applications, the latter of which would not have been generated inside the agency. *See id.* However, while the Federal Reserve Banks may be in the business of issuing loans, OSHA is not in the business of manufacturing aluminum. Accordingly, Plaintiff's FOIA

9

request specifically sought records "relating to *Century Aluminum's* compliance obligations with the Beryllium standard," not OSHA's compliance obligations. *see* Compl., ECF No. 1 ¶ 5.

As for *Detention Watch Network v. ICE*, 215 F. Supp. 3d 256 (S.D.N.Y. 2016), Plaintiff's reliance on this case is even further adrift because the holding smacks against governing law in this district. Specifically, the case held that information about rates contained in a final government contract are not protected by Exemption 4 because at the point where the rates become part of an executed government contract that information could no longer be considered "obtained from" the contractors as the contract was generated by the agency. *See id.* at 262–63. The problem with this holding is that *this* district does not require information that is negotiated, or becomes part of an agency-generated document, to lose its protection under Exemption 4. *See Judicial Watch, Inc.*, 108 F. Supp. 2d at 28.

As a final matter, Plaintiff's claims that its FOIA request for information regarding Century's compliance with OSHA Beryllium standard is analogous to a FOIA request for a government agency's own initiated audit or its own calculations of excess federal contractor profits to render the information unprotected by Exemption 4. *See* Pl's Mem at 17 (citing *Philadelphia Newspapers, Inc. v. Dep't of Health & Hum. Servs.*, 69 F. Supp. 2d 63, 67 (D.D.C. 1999), and *Fisher v. Renegotiation Board*, 355 F. Supp. 1171 (D.D.C. 1973)). Such cases would be more analogous *if* Plaintiff was seeking OSHA's own initiated investigation into Century Aluminum's compliance efforts, or OSHA's own calculated data on Century Aluminum's beryllium exposure levels, neither of which best describes the request at hand.

**B. The Record Establishes That the Information DOL Withheld Under Exemption 4 is <u>Commercial Information.</u>**

Plaintiff argues that information contained in Century's Abatement Plan cannot be deemed commercial because the information relates to Century's compliance obligations under the

Beryllium standard, which is legal in nature. Pl's Mem. at 32–33. However, courts in this district have easily found that information that relates to a company's legal or compliance obligations may still be deemed "commercial or financial" information as long as it *relates* to business or trade. *See, e.g., 100Reporters LLC v. United States Dep't of Just.*, 248 F. Supp. 3d 115, 137 (D.D.C. 2017) (finding that documents revealing the ways in which a company complies with its legal obligations is commercial because those documents, even when only used for training purposes, are instrumental to business operations); *Pub. Citizen v. United States Dep't of Health & Hum. Servs. (Pub. Citizen II)*, 975 F. Supp. 2d 81, 109 (D.D.C. 2013) (finding a transmittal memorandum sent to the Inspector General as part of Purdue's annual compliance report included information regarding Purdue's promotional monitoring program, which is commercial information). Indeed, governing law holds that the fundamental "question of whether information is 'commercial' boils down to a commonsense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009).

In this case, the record amply shows that DOL meets this commonsense inquiry. For example, it is undisputed that information contained in Century's Abatement Plan includes engineering and work practice controls, including housekeeping measures, which when implemented, directly affect Century's day-to-day business operations. *See* Pl's Resp. SMF ¶¶ 6, 21–22, 29; *see also infra*, Sec. I. It is also undisputed that the more efficient and effective these business operations are at limiting beryllium exposure, the more competitive Century is in the market, and the more profitable it is. *See* Pl's Resp. SMF ¶¶ 25–26, *see also infra*, Sec. I. Thus, while Century's beryllium reduction measures, when implemented, bring Century into compliance with OSHA's Beryllium standard, Century also has a very clear business interest in that information. *See Majuc v. Dep't of Just.*, Civ. A. No. 18-CV-566 (APM), 2022 WL 266700, at *5

11

(D.D.C. Jan. 28, 2022) (finding that compliance memoranda regarding various legal issues arising in the context of the embargoed and sanctioned countries with which the submitter was in business, were protected under Exemption 4 because the memoranda served a commercial function in that they were helpful or instrumental to the submitter's business interests and operations); *Leopold v. Dep't of Just.*, Civ. A. No. 19-3192 (RC), 2021 WL 124489, at *8 (D.D.C. Jan. 13, 2021) (finding a report into a bank's compliance to maintain an effective anti-money-laundering program was commercial within the meaning of Exemption 4 because it contained "extensive proprietary, financial, and competitive business information."); *see also* C*ornucopia Inst. v. Dep't of Agric.*, Civ. A. No. 16-148 (RC), 2018 WL 4637004, at *11 (D.D.C. Sept. 27, 2018) (finding that there is "no doubt that the production output information qualifies as information in which submitters have a 'commercial interest.'").

In addition, information in the Abatement Plan constitutes clear commercial information because it serves as a "highly valuable playbook," which, if disclosed, could be "readily copied by Century's competitors." *See* Keen Decl. ¶¶ 18, 21; Harbath Decl. ¶¶ 13, 16–17; Pl's Resp. SMF ¶¶ 28, 30; *see also infra*, Sec. I. Specifically, Century's Abatement Plan is even more valuable in the market because it focused on improving facility efficiencies, rather than acquiring new production capacity or restarting existing production capacity. *See* Harbath Decl. ¶ 13; *see also Pub. Citizen v. Dep't of Health & Hum. Servs. ("Pub. Citizen III")*, 66 F. Supp. 3d 196, 210 (D.D.C. 2014) (holding that submitter's FDA compliance information could pose a competitive risk because the materials were, "in a sense, a free roadmap as to what works in pharmaceutical marketing without violating the legal framework of regulatory enforcement and laws that govern the industry.").

12

Ignoring all these facts from the record, Plaintiff relies heavily on an unpublished opinion from the Southern District of New York, to argue that information relating to compliance obligations, like Century's compliance with the Beryllium standard, cannot be deemed commercial *unless* that information is "inextricably intertwined" with other information that reveal basic commercial operations or information that is "transactional" in nature.[2] *See* Pl's Mem. at 33–34 (citing to *New York Times Co.*, Civ. A. No. 19-1424, 2021 WL 371784); *see also id.* at 36 (arguing that information can only be commercial if it is "transactional"). As an initial matter, this opinion from the Southern District Court in New York has no precedential value. But even if considered, this Court should be wary of the holding to the extent it tries to narrow Exemption 4 "only to records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'" *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (finding that letters describing "favorable market conditions for domestic [lumber] companies" constituted "commercial information" because those companies "have a 'commercial interest' in such letters" (citing *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). The word "transactional" does not appear in the statutory language, 5 U.S.C. § 552(b)(4), and both the Supreme Court and the D.C. Circuit have instructed that the terms "commercial financial information" should be given "their ordinary meanings" and has rejected the argument that "commercial" be confined only to records that "reveal basic commercial

---

[2]     For example, the part of this unpublished opinion to which Plaintiff refers describes the basic commercial records that would need to exist for information to be deemed commercial as: "(i) sales statistics, profits and losses, and inventories; (ii) references to finance functions, mergers and acquisitions practices, and sales and marketing, or information about country operations, projects, contracts, and bids; (iii) information about interactions between the companies' salespeople and customers, or how the companies promote their products; and (iv) extensive information about the company's marketing and sales programs and contracting processes." *New York Times Co. v. Dep't of Just.*, Civ. A. No. 19-1424, 2021 WL 371784 at *12 (S.D.N.Y. Feb. 3, 2021).

operations." *Id.*; *see also FMI*, 139 S. Ct. at 2364. Indeed, Plaintiff leads the Court in the wrong direction when it argues that "information defining Century's obligations under the Beryllium standard, regardless of the impact of those obligations on Century's business" cannot make that information commercial because that information does not reveal information such as revenue, net worth, income, EBITDA, sales statistics, profits and losses, and inventories. *See* Pl's Mem. at 36; *Baker & Hostetler LLP*, 473 F.3d at 319.

While information contained in the Abatement Plan might not expressly state bottom-line profits, pricing, or business sales, Century clearly has a commercial stake in information that lays out a carefully crafted playbook into Century's business operations at three different aluminum facilities. *See People for the Ethical Treatment of Animals v. Dep't of Health & Human Serv.*, 901 F.3d 343, 354 (D.C. Cir. 2018); *Kahn*, 648 F. Supp. 2d at 36; *Forest Cnty. Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181, 200 (D.D.C. 2017) (concluding that information related to establishing a casino was "commercial 'in its function,' as the [tribe has] 'a commercial interest at stake in its disclosure'"); *Elec. Priv. Info. Ctr. v. DHS*, 117 F. Supp. 3d 46, 62-63 (D.D.C. 2015) (holding that identities of corporations participating in pilot security program were exempted from release because "[t]he identities of which companies have participated in [the program], if disclosed, could have a commercial or financial impact on the companies involved").

### C. **The Record Shows That All Information DOL Withheld is Confidential.**

A commercial or financial matter is considered confidential under Exemption 4 if it is "customarily kept private, or at least closely held, by the person imparting it." *FMI*, 139 S. Ct. at 2363. In *FMI*, the Supreme Court held that commercial or financial information is "confidential" within the meaning of Exemption 4 "[a]t least" where the information is "customarily and actually treated as private by its owner" and, possibly, "provided to the government under an assurance of

14

privacy." *Id.* at 2366. The record in this case establishes that DOL has met its burden in showing that Century customarily and actually treats information in the Abatement Plan private. In addition, though it is not required that DOL assure Century it will keep the information confidential, the record shows that such assurances exist in this case. *See Shapiro v. Dep't of Just.*, Civ. A. No. 12-0313 (BAH), 2020 WL 3615511 at *26 (July 2, 2020); *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019).

### 1. DOL has met its burden of proof to show that all withheld information is customarily and actually treated as confidential.

When determining whether a matter is customarily and actually treated as confidential, Courts focus on the practices of the submitter. *See FMI*, 139 S. Ct. at 2366. Thus, the "heart of the [confidentiality] test" in this case asks whether DOL can show that Century customarily and actually treats the information in its Abatement Plan as private. *Renewable Fuels Ass'n v. United States Env't Prot. Agency*, Civ. A. No. 18-2031 (JEB), 2021 WL 602913, at *6 (D.D.C. Feb. 16, 2021). DOL can meet this burden "through affidavits or declarations that 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *PETA*, 901 F.3d at 349 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

In this case, the undisputed facts show that Century customarily keeps private the redacted information contained in the Abatement Plan. As previously discussed, Century's Abatement Plan contains a series of engineering and work practice controls, including housekeeping measures that reduce and maintain exposure to beryllium. *See* Pl's Resp. SMF ¶ 6. Century guards this information the same way any aluminum manufacturer tightly guards their process efficiencies because benchmark pricing for aluminum and the high cost of power cause these remaining

15

efficiencies in aluminum production to have a disproportionate impact on profits. *See id.* ¶¶ 24–26; *see also infra*, Sec. I. Disclosing these measures, therefore, would amount to offering competitors a very valuable playbook for how to operate more profitably. *See* Pl's Res. SMF ¶¶ 22, 26; *see also infra*, Sec. I

Beyond customarily treating information in its Abatement Plan as confidential, the record, also shows that Century actually does keep information in this Plan confidential. For example, Century maintains that "at no time, has the Abatement Plan been reviewed by or provided to any person or entity—inside or outside of Century—other than Century's top management or supervisory personnel . . . who[] had a direct interest in the implementation of . . . the Abatement Plan based on their area of expertise and [are] governed by an obligation to protect company confidential information." *See* Harbath Decl. ¶ 21. In addition, when it comes to implementing measures in the Abatement Plan, Century specifically delegates "isolated tasks and projects" to employees and vendors "without a view to the performance of other abatement work," all of whom are also bound by their employment to confidentiality policies. *See id.* ¶¶ 21, 25–29. Of the total number of employees that Century has at its three facilities affected by the Abatement Plan, only 1.6 to 2.8 percent of these employees have been allowed access to the Abatement Plan. *See id.* ¶¶ 22–24.

In addition, it is undisputed that the redacted Abatement Plan produced to Plaintiff in this case includes an express provision designating the information contained therein as confidential commercial information. *See* Pl's Resp. SMF ¶¶ 7, 19; *see also infra*, Sec. I. It is also undisputed that when United Steelworkers' counsel asked for a copy of the final Abatement Plan contained in the executed settlement agreement, Century would not provide the Plan without United Steelworkers agreeing to execute a confidential and non-disclosure agreement. *See* Pl's Resp. SMF

¶ 23; *see also infra*, Sec. I; Keen Decl. ¶ 22; Harbath Decl. ¶ 32, Attchs. B–C. Likewise, when United Steelworkers asked Century for a draft copy of the Abatement Plan, Century provided the draft only on condition that United Steelworkers would keep the draft confidential and use it only for the purposes of settlement discussions with Century and OSHA. *See* Keen Decl. ¶ 22; Harbath Decl. ¶ 31, Attach. A. Additionally, although Century had to disclose a draft Abatement Plan to OSHA as part of its settlement agreement, it only did so with assurances from OSHA to protect the Plan as confidential. *See* Harbath Decl. ¶ 20; *see* Baird Decl. ¶ 10, Ex. 4.

Plaintiff contends that the evidence disputes this showing that Century does not customarily keep the information contained in its Abatement Plan private because OSHA also provided a draft of the Abatement Plan to United Steelworkers' counsel, Randy Rabinowitz, "without restrictions." Pl's Mem. at 21. This argument, however, is disingenuous and mischaracterizes the record. Before OSHA sent a copy of the draft to United Steelworkers, it confirmed with Century which parts of the Abatement Plan it could reveal to United Steelworkers. *See* Def's Resp. SMF ¶ 33. After doing so, OSHA provided Ms. Rabinowitz with only the parts of the draft Abatement Plan that related to Century's Kentucky plants and not Century's South Carolina plant, because United Steelworkers represented workers in Kentucky but not in South Carolina. *See* Baird Decl. ¶¶ 7–8, Ex. 1. Moreover, the record shows that Ms. Rabinowitz understood that the United Steelworkers were only being provided copies of the draft on the condition of confidentiality and for settlement purposes only. *See id.* ¶ 5, Ex. 1; Harbath Decl. ¶ 31 (stating that "Century only contemplated providing United Steelworkers with a draft Plan because of United Steelworkers' critical importance to the resolution of the litigation."); *id.* Attach. A; Def's Resp. SMF ¶ 34–36, 38. Furthermore, the draft of the Abatement Plan that OSHA produced to Ms. Rabinowitz was marked as confidential for settlement purposes. *See* Baird Decl. ¶ 9.

17

Plaintiff also contends that after Century executed its settlement agreement with OSHA, Century's counsel sent Ms. Rabinowitz an email on October 14, 2020, which "led her to believe" that Century no longer considered the drafts of the Abatement Plan confidential. *See* Pl's Mem. at 21; Def's Resp. SMF ¶ 40. However, this, argument, again, misconstrues the record because in the email to which Plaintiff refers, Century's counsel is negotiating the terms of the confidentiality agreement with Ms. Rabinowitz that would allow United Steelworkers to view the final Abatement Plan. *See* Harbath Decl., Attch. B. Accordingly, in the email, Century's counsel is explaining to Ms. Rabinowitz that if United Steelworkers is willing to enter into a confidentiality agreement to view the final abatement plan, Century will not prohibit United Steelworkers from discussing "the contents of the draft settlement agreements to the extent such discussions do not confirm what is or isn't actually in the executed settlement agreement itself." *Id.* Because the parties never entered into a confidentiality agreement to allow United Steelworkers to view the final Abatement Plan, this email communication is irrelevant and fails to establish any genuine issue of material fact even viewed in the light most favorable to Plaintiff. *See id.* ¶ 32; Pl's Resp. SMF ¶ 23.

As a final matter, Plaintiff also speculates that the Abatement Plan likely includes information that is regularly used in the industry and is described on the Federal Register and also reference the requirements of "a state permit." *See* Pl's Mem. at 22. Setting aside these vague speculations, the clear evidence in the record establishes that what *is* included in the Abatement Plan is a carefully crafted playbook describing the measures by which Century has determined it can improve its facilities' productivity while maintaining low beryllium emissions in compliance with federal law. *See* Harbath Decl. ¶ 13; Pl's Resp. SMF ¶ 6, 14, 28; *see also infra*, Sec. I. Thus, the Plan describes measures that Century has decided to take to improve efficiencies, invest in new equipment, develop and implement new processes, and tightly manage costs of existing assets in

18

an industry where competitors manage and operate similar facilities. *See id.* ¶¶ 13, 17; *see* Pl's Resp. SMF ¶¶ 28–29; *see also infra*, Sec. I. In addition, even if disclosing small pieces of information in the Abatement Plan would not mean anything, the disclosure of the entire Plan, when taken together, would expose Century's highly confidential business acumen and afford its competitors a "how-to" guide to improve their facilities, at a huge competitive gain for competitors and a loss for Century. *See id.* ¶¶16–19. This argument is often referred to in other FOIA context as the "mosaic theory" in which the Supreme Court has recognized that "[w]hat may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *CIA v. Sims*, 471 U.S. 159, 178 (1985) (holding that the Director of the CIA has power to withhold superficially innocuous information on the grounds that it might enable an observer to discover the identity of an intelligence source); *see also Ctr. for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003) (applying the mosaic theory in an analogous FOIA case where the information at issue was a list of names of persons detained for investigation into the September 11, 2001 attacks compiled for law enforcement and investigation purposes); *Edmonds v. U.S. Dep't of Just.*, 405 F. Supp. 2d 23, 32 (D.D.C. 2005) ("A 'mosaic' of information forms when, '[t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.'" (citing *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978)).

19

**2. The Abatement Plan is not a variance, or a settlement agreement that is regularly publicized on OSHA's website.**

Although the record clearly establishes that Century customarily and actually maintains information contained in the Abatement Plan as confidential, Plaintiff contends, that because DOL publishes variances and settlement agreements on its website, DOL cannot establish that the information contained in the Abatement Plan is confidential. *See* Pl's Mem. at 19–20. This argument, however, is a red herring because Plaintiff has failed to show that *Century's* Abatement Plan has been published anywhere, and this Court's assessment focuses on whether *Century* customarily and actually maintains the information contained in the Abatement Plan as confidential, which the uncontradicted evidence demonstrates *Century* does. In any event, taking each argument, in turn, reveals that neither one has merit.

First, the information contained in the Abatement Plan is not a variance. *See* 29 U.S.C. § 655(d). "A variance is a regulatory action that permits an employer to deviate from requirements of an OSHA standard." *See* OSHA's Variance Program, Department of Labor, https://www.osha.gov/variance-program (last visited Mar. 25, 2022). Here, it is undisputed that rather than granting Century a deviation from the requirements of the Beryllium standard, the Abatement Plans in specifically reflected the measures by which Century *would comply* with that standard. *See* Pl.'s Resp. Def's SMF ¶ 6; Keen Decl. ¶ 9, Ex. 2; *see also* Def's Resp. Pl.'s SMF ¶ 59.

Second, while it is true that DOL customarily posts certain settlement agreements on its website, some of which contain abatement plans, the settlement between OSHA and Century containing the Abatement Plan at issue in this case does not fall under the category of commonly posted settlement agreements. *See* Def's Resp. SMF ¶ 71. Specifically, Plaintiff points to a list of "Corporate-Wide Settlement Agreements," posted on OSHA's website, including one specific

20

settlement posted publicly on that website between OSHA and Republic Steel, which contains an abatement plan. *See id.* ¶ 72; Pl's Mem. at 20–21. However, as OSHA's website describes, the Corporate-Wide Settlement Agreements that it routinely publicizes "are legal agreements reached between OSHA and employers that have shown a pattern of non-compliance or have similar OSH Act violations at multiple establishments or worksites." Corporate-Wide Settlement Agreements, Department of Labor, https://www.osha.gov/enforcement/cwsa (last visited Mar. 25, 2022). It is undisputed, in this case, that Century did not enter the settlement agreement with OSHA because of a pattern of non-compliance, but to resolve Century's challenge to OSHA's final rule regarding its Beryllium standard. *See* Pl's Resp. SMF ¶¶ 3, 5. Thus, the settlement agreement at issue in this case, along with the Abatement Plan therein, is not the type of settlement agreements that OSHA routinely publishes. In any event, the evidence and Century's intervention in this action to protect the information both strongly suggest that Century would have objected to any disclosure of the information by OSHA even as part of a settlement and insisted on appropriate redaction of its Abatement Plan.

### 3. There is no obligation that requires written exposure control plans to be made publicly available and Century regularly keeps such plans confidential.

Plaintiff next argues that information contained in the Abatement Plan cannot be considered confidential and "closely guarded" when Century is required by law to disclose the same information in its Abatement Plan, namely measures that limit beryllium exposure, to its employees and employees' representatives in what is described as a "written exposure control plan." *See* Pl's Mem. at 22. Even assuming that information contained in the Abatement Plan overlaps with Century's written exposure control plans, Plaintiff's argument regarding what Century must do with those plans overstates the law. Nothing in the Beryllium standard explicitly requires employers to give employees unrestricted access to an employer's exposure control plans.

*See* 29 C.F.R. § 1910.1020(e). Likewise, nothing in this standard explicitly prevents employers from requiring employees who request access to an exposure control plan to keep the plan confidential. *See id.* To the contrary, the Beryllium standard speaks for itself and requires only that the employer "make a copy of the written exposure control plan accessible to each employee who is, or can reasonably be expected to be, exposed to airborne beryllium," *id.* § 1910.1024(f)(1)(iii), when *requested* by the employee or a designated representative of the employee. *See id.* § 1910.1020(e)(1)(i). After that, the employer needs only provide access to those records "in a reasonable . . . manner." *Id.*

Plaintiff speculates without any basis that Century must widely distribute its exposure control plans to each of its employees at its different aluminum plants. However, according to the Beryllium standard and according to Century, if an employee, or an employee's designated representative requests a copy of Century's exposure control plan, the employee is required to preserve the confidentiality of the plan and will not be permitted to review the document unless he or she commits to doing so. *See* Supp. Declaration of Dennis Harbath ("Harbath Supp. Decl.") ¶¶ 3–4.

### 4. The record shows that DOL assured Century that it would maintain the withheld information in the Abatement Plan as confidential.

"Although several district courts have resolved Exemption 4 disputes since [*FMI*], none have held that th[e] potential second prong [regarding agency assurances] must be met." *Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021); *see, e.g.*, *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 ("Given that the defendants' declarations are already deficient for other reasons, at this stage there's no need to resolve whether Exemption 4 in fact imposes an assurance of privacy requirement.") (cleaned up); *Citizens for Responsibility & Ethics in Washington v. Dep't of Commerce*, No. 18-3022, 2020 WL 4732095, at *3 (D.D.C. Aug.

14, 2020) (assuming without deciding that second prong exists and finding it satisfied by implicit assurance of privacy). Put differently, no court has yet held that "privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without" privacy assurances. *Renewable Fuels Ass'n*, 519 F. Supp. 3d at 12; *see also FMI*, 139 S. Ct. at 2363. Plaintiff agrees that this is the status of governing law in this district. *See* Pl's Mem. at 27.

Since the Supreme Court's decision in *FMI*, at least one court in this jurisdiction has also held that it would be improper to "read the word 'confidential' to impose a blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4," and "[t]he better approach would be that privately held information is generally confidential absent an express statement by the [government] agency that it would not keep information private, or a clear implication to that effect (for example, a history of releasing the information at issue)." *Renewable Fuels Ass'n*, 519 F. Supp. 3d at 12 (citing *Gellman v. Dep't of Homeland Sec.*, Civ. A. No. 16-0635 (CRC), 2020 WL 1323896, at *11 n.12 (D.D.C. Mar. 20, 2020)). Thus, "whether the agency provided an assurance of privacy is [at most considered] relevant to determining whether commercial information possessed by CMS is confidential." *Shapiro v. Dep't of Justice*, Civ. A. No. 12-313 (BAH), 2020 WL 3615511, at *26 (D.D.C. July 2, 2020) (quotations omitted). In addition, when an agency provides an assurance of confidentiality, that assurance can be either express or implied. *See Citizen for Resp. & Ethics in Wash.*, Civ. A. No. 18-3022 (CJN), 2020 WL 4732095, at *3 ("Assuming that Exemption 4 can be satisfied here only if Commerce gave [the submitter] some assurance of confidential treatment, that assurance of confidentiality [can be] either express or implied.").

Nevertheless, this issue is mostly academic because the record in this case shows that DOL provided an express assurance of confidentiality. First, it is undisputed that the Abatement Plan contains an express statement of confidentiality. *See* Pl's Resp. SMF ¶¶ 7, 19, *see also infra*, Sec. I. Although Plaintiff argues that this assurance comes specifically from Century and not OSHA, the same paragraph provides that OSHA, too, will treat the information in the Abatement Plan as confidential commercial information when it states that it will evaluate the information in accordance with 29 C.F.R. § 70.26 and applicable law. *See* Keen Decl. ¶ 10, Ex. 2, Appendix D (Abatement Plan) n.1; 29 C.F.R. § 70.26 (stating that "[c]onfidential commercial information will be disclosed under the FOIA only in accordance with this section and Executive Order 12,600."). In addition, in its declaration, from Dennis Harbath, Century affirmed that it "would not have entered into a Settlement Agreement without assurance from OSHA that OSHA would protect the Abatement Plan as confidential in the event of a third party's request for access." *See* Harbath Decl. ¶ 20.

Plaintiff, nonetheless, argues that this evidence, even when taken together is not enough to prove that OSHA expressly assured that it would maintain the information in the Abatement Plan as confidential, where it leaves open the possibility that such information could be released. *See* Pl's Mem. at 30. Setting aside the fact that an assurance of confidentiality need not be express, *see Citizen for Resp. & Ethics in Wash.*, Civ. A. No. 18-3022 (CJN), 2020 WL 4732095, at *3, DOL can go one step further and confirm in its supplemental declaration from Edmund Baird, that it did, in fact, expressly agree to keep the information contained in the Abatement Plan confidential. *See* Baird Decl. ¶ 10, ex. 3. Indeed, in October 2020, counsel from OSHA expressly responded to Ms. Rabinowitz's request for a copy of the final settlement agreement stating that DOL had

24

"agreed to keep the agreement confidential to the extent possible because it contains proprietary information about Century's plants." *See id.*

Undoubtedly, Plaintiff is likely to argue in its reply brief that even this October 2020 email from OSHA's counsel, too, is still not enough to discount the possibility that DOL might release information in the Abatement Plan responsive to a FOIA search. Courts in this district do not require such draconian standard. Rather, when an agency gives a submitter even "some assurance of confidential treatment" this is sufficient to satisfy Exemption 4. *See Citizens for Resp. & Ethics in Wash. v. Dep't of Com.*, Civ. A. No. 18-03022, 2020 WL 4732095, *3. Here, DOL gave more than some assurance of confidentiality, it expressly agreed to process information contained in the Abatement Plan as confidential commercial information and denied the United Steelworkers a copy of the final settlement agreement on account that it had assured Century that it would keep the agreement confidential. This case is far from those on which Plaintiff relies in which an agency has expressly notified the submitter that the information *would be* released. *See* Pl's Mem. at 30 (citing *WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 16 (D.D.C. 2020); *Ctr. for Investigative Reporting v. Dep't of Labor*, 470 F. Supp. 3d 1096, 1114 (N.D. Cal. 2020)).

Thus, while not required, it is clear that DOL provided express, or at least implied, assurances of confidentiality to Century.

## III.   DOL HAS MET ITS BURDEN IN SHOWING FORESEEABLE HARM.

Plaintiff concedes that no appellate court has addressed the standard for establishing foreseeable harm in Exemption 4 cases, yet nonetheless, insists that the standard that should apply to establish foreseeable harm in this case is the standard set by *Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113. There, the Court provided a two-part test for establishing foreseeability. *Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113. First, the defendant must explain how disclosing, in

25

whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing 'genuine harm to [the submitter's] economic or business interest," and (2) explain how that harm would "thereby dissuad[e] others from submitting similar information to the government." *Id.* Contrary to Plaintiff's assertions, however, DOL has not argued that the foreseeability standard in *Ctr. for Investigative Rep.*, is the "correct standard" to apply in this case. *See* Pl's Mem. at 39. Instead, DOL has pointed to the "substantial competitive harm" test more broadly that existed prior to *FMI*, as being more instructive as this was the standard that the FOIA Improvement Act's "foreseeable harm" requirement replaced after the Supreme Court overruled the substantial competitive harms test. *See* Def's Mem. at 18. Under this test, a "party invoking Exemption 4 does not need 'to prove disclosure certainly would cause it substantial competitive harm, but only that disclosure would likely do so.'" *See 100Reporters LLC*, 248 F. Supp. 3d at 138 (citing *McDonnell Douglas Corp. v. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

Nonetheless, DOL will not quibble over the distinction between the two standards as a showing of substantial competitive harm will also satisfy a showing of harm to the submitter's economic or business interest under prong one of the *Ctr. for Investigative Rep.* standard. *See Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113 (holding that "the defendants must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption" and citing to competitive disadvantage as being one such interest protected by this exemption) (citing *Soucie v. David*, 448 F.2d 1067, 1078 (D.C. Cir. 1971)). Moreover, there is also an obvious chilling effect that exists in this case should information contained in the Abatement Plan be released, which is that a business, like Century, may no longer

want to submit a petition for review to bring an action challenging a final rule against OSHA. *See* 29 U.S.C. § 660.

Starting with a showing of substantial competitive harm, Plaintiff does not dispute that the record in this case shows that the disclosure of information contained in the Abatement Plan will cause Century to suffer substantial competitive harm. *See* Def's Mem. at 18–22; Pl's Mem. at 38–40. To summarize, the record shows that disclosing Century's Abatement Plan would almost certainly result in immediate financial loss and competitive harm to Century. First, the disclosure would immediately deprive Century of all efforts spent to create its Abatement Plan, including millions of dollars in investment and research and unquantifiable costs for redirection, time, and effort. *See* Harbath Decl. ¶ 12. Second, disclosure would "create a windfall to Century's competitors by allowing them to profit from Century's investment of time, money, and ingenuity at no expense." *See id.* ¶¶ 16–17; *See PETA*, 901 F.3d at 354 (agreeing with the agency that disclosing the airline carriers and transport routes used by private importers would provide an unfair "windfall" to competitors who could thereby "enter the market without the startup costs associated with researching successful importation means and practices"); *Leopold v. Dep't of Just.*, Civ. A. No. 19-3192 (RC), 2021 WL 124489, * 7 (finding that defendant met the standard of showing foreseeable harm when "[t]he release of [withheld] information could disadvantage [the submitter] and provide an unfair advantage to its competitors.").

This disclosure would also be especially harmful to Century because the general operations of its facilities and its competitors' facilities are similar enough that the Abatement Plan measures could be easily adapted and implemented at competitor sites at little to no cost, investment, and interruption to production. *See* Harbath Decl. ¶ 18; *Pub. Citizen II*, 66 F. Supp. 3d at 210 (holding that disclosure of FDA compliance information could pose a competitive risk because the materials

were, "in a sense, a free roadmap as to what works in pharmaceutical marketing without violating the legal framework of regulatory enforcement and laws that govern the industry."). Meanwhile, Century will almost certainly suffer an information imbalance, given that Century's competitors are likely safeguarding whatever beryllium exposure abatement plans they have developed. *See id.* ¶ 19. The effect of this windfall to Century's competitors and information imbalance to Century will also almost certainly result in long-term negative financial impact on Century's profits, shareholders, and its competitive position in the market. Such loss is not something that Century would be able to recover from quickly given how much time, costs, and investment is required to develop these process efficiencies. *See id.* In addition, turning to alternatives like capitol expansion to make up for lost ground from this disclosure would not help Century's position, as nothing prevents Century's competitors from doing the same thing, in addition to implementing the process efficiencies contained in Century's Abatement Plan. *See id.* ¶¶ 13, 19.

Plaintiff argues, that DOL cannot establish a showing of harm to Century's business interest because Exemption 4 does not protect a company's interest in concealing the degree to which it does not have to comply with regulatory requirements. *See* Pl's Mem. at 39. But Century's Abatement Plan does not reflect the manner in which Century does not have to comply with regulatory compliance. To the contrary, it expressly lays out the measures by which Century must take to come *into* compliance with the same regulatory standard with which others in the industry comply. *See* Pl's Resp SMF ¶ 6; Keen Decl. ¶ 9, Ex. 2; *see also* Def's Resp. SMF ¶ 59.

Having established, then, that disclosing the information in Century's Abatement Plan would result in substantial competitive harm and harm to its business interests, there is also an obvious chilling effect that would accompany this harm as a result of disclosing information contained in the Abatement Plan. Specifically, a business, like Century may not remain willing to

28

submit a petition for review to bring an action challenging a final rule against OSHA if it knew that the risk of resolving the action might result in disclosing its confidential commercial information. *See* 29 U.S.C. § 660. However, robust public participation is vital to agency rulemaking, because by engaging in such process, agencies can benefit from access to comprehensive information and improved public support, while also being held to account for their decisions.

Thus, the record establishes that disclosing Century's information in its Abatement Plan would cause substantial competitive harm and harm to its economic and business interest, such that the harm would dissuade others form submitting similar information to the government. *See Ctr. for Investigative Rep.*, 436 F. Supp. 3d at 113.

## IV.    DOL RELEASED ALL REASONABLY SEGREGABLE INFORMATION.

If a responsive record contains information exempt from disclosure, any "reasonably segregable" nonexempt information must be disclosed. 5 U.S.C. § 552(b). To establish that all reasonably segregable, nonexempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, DOL examined the one record, that it found responsive to Plaintiff's FOIA request, after the request was narrowed, and produced it subject to Exemption 4, only. *See* Keen Decl., Ex. 2. Moreover, where exempt information was reasonably segregable from non-exempt information,

29

DOL redacted only the exempt information and produced the rest. *See* Declaration of Lee Grabel ("Grabel Decl.") ¶ 6. For example, DOL did not withhold the entire document, but only those which set for the abatement plans for each of Century Aluminum's three locations, along with Appendices D-1, D-2, and D-3 to the Abatement Plan. *See id.*; Keen Decl. ¶ 15. Thus, the first page of the Abatement Plan, along with all headers, and all remaining sections II–IV were released as not subject to Exemption 4. *See id.* Plaintiff speculates that the final Abatement Plan nonetheless contain reference to requirements set forth in a Clean Air Act permit issued by a state agency. *See* Pl's Mem. at 37–38. But this speculation is unsupported as it is based only on information Plaintiff would have reviewed in the draft Abatement Plan, which did not reference the actual requirements of the Clean Air Act. *See* Harbath Supp. Decl. ¶ 5. Accordingly, all segregable material has been released.

Therefore, the Court should find that DOL released all reasonably segregable information and that DOL is entitled to summary judgment.

## CONCLUSION

Thus, for the reasons discussed above, and contained in DOL's memorandum in support of summary judgment, the information contained in Century's Abatement Plan for its three locations was properly withheld under FOIA Exemption 4 because it is "commercial information" that was "obtained from a person" and is "confidential." Moreover, DOL has clearly met a showing that disclosing such information would cause foreseeable harm and that it produced all reasonably segregable information without risk of incurring that harm. Accordingly, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment.

Dated: March 25, 2022                                          Respectfully submitted,

Baruch A. Fellner                                    MATTHEW M. GRAVES, D.C. Bar. #481052
D.C. Bar #061630                                   United States Attorney
BFellner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP           BRIAN P. HUDAK
1050 Connecticut Ave., NW                    Acting Chief, Civil Division
Washington, DC
Telephone: 202-955-8591                      By: */s/ Anna D. Walker*
                                                                                 _____
                                                                     ANNA D. WALKER
*Attorney for Century Aluminum Company*          Assistant United States Attorney
                                                                     555 Fourth Street, NW
                                                                     Washington, DC 20530
                                                                     202-252-5244
                                                                     anna.walker@usdoj.gov

                                                                     *Attorneys for the United States of America*

31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OCCUPATIONAL SAFETY & HEALTH
LAW PROJECT, PLLC,

   *Plaintiff*,

  v.

U.S. DEPARTMENT OF LABOR,       Civil Action No. 21-2028 (RCL)

   *Defendant*,

and

CENTURY ALUMINUM COMPANY,

   *Intervenor.*

**DEFENDANT'S RESPONES TO PLAINTIFF'S CROSS-STATEMENT OF FACTS**

Pursuant to Local Rule 7(h), Defendant U.S. Department of Labor ("DOL") submits this response to Plaintiff's Cross-Statement of Undisputed material facts.

**Century Aluminum's Petition for Review and Settlement with OSHA**

32.  On April 10, 2018, OSHA through counsel sent Randy Rabinowitz, in her capacity as counsel to United Steelworkers, a copy of a draft of the Abatement Plan Agreement between Century and OSHA that would be incorporated into a settlement between Century and OSHA to resolve Century's petition for review of the beryllium standard that was pending in the United States Court of Appeals for the Eighth Circuit. Rabinowitz Decl. ¶¶ 5, 6.

**DEFENDANT'S RESPONSE**: Undisputed that on April 10, 2018, OSHA through counsel sent Randy Rabinowitz a copy of a draft of the Abatement Plan Agreement between

Century and OSHA. Disputed as to the fact that the draft "would be incorporated into a settlement." *See* Declaration of Edmund C. Baird ("Baird Decl.") ¶ 10, Ex. 4.

33.    Before OSHA sent Ms. Rabinowitz the draft Abatement Plan Agreement, OSHA's counsel stated that she was "waiting to hear back from Century on which parts of the abatement plan and other guidance we can share." Id. ¶ 6. The next day, OSHA provided through counsel, without any redactions, the draft Abatement Plan Agreement between Century and OSHA. Id.

**DEFENDANT'S RESPONSE**: Undisputed as to the first sentence. Disputed as to the second sentence because after conferring with Century, OSHA, through counsel, provided Ms. Rabinowitz with only part of the then-current draft Abatement Plan that related to the two Century facilities in Kentucky and not the third in South Carolina because United Steelworkers did not represent workers at the South Carolina facility. *See* Baird Decl. ¶ 8, Ex. 3.

34.    Counsel for OSHA did not inform Ms. Rabinowitz that the draft Abatement Plan Agreement was required to be kept confidential, nor did counsel for OSHA request that Ms. Rabinowitz keep the draft Abatement Plan Agreement private or secret. Id. ¶ 7.

**DEFENDANT'S RESPONSE**: Undisputed that counsel for OSHA did not inform Ms. Rabinowitz that the draft Abatement Plan Agreement was required to be kept confidential. However, Ms. Rabinowitz understood that United Steelworkers was only being provided copies of drafts of the Abatement Plan Agreement on the condition of confidentiality, and that such drafts were being shared because Century viewed United Steelworker's as "critical[ly] important[t] to the resolution of the litigation over the Beryllium standard" between Century and OSHA. *See* Declaration of Dennis Harbath, ECF No. 17-4 ("Harbath Decl.") ¶ 31, Attch. A; Baird Decl. ¶ 5.

2

35.    Ms. Rabinowitz received the draft Abatement Plan Agreement from OSHA without any restrictions that the information must be kept confidential or prohibiting the information's dissemination. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. Ms. Rabinowitz understood that United Steelworkers was only being provided copies of drafts of the Abatement Plan Agreement on the condition of confidentiality, and that such drafts were being shared because Century viewed United Steelworker's as "critical[ly] important[t] to the resolution of the litigation over the Beryllium standard" between Century and OSHA. *See* Harbath Decl. ¶ 31, Attch. A; Baird Decl. ¶ 5. In addition, the draft Abatement Plan provided to Ms. Rabinowitz was labeled as a draft and marked as "CONFIDENTIAL TREATMENT REQUESTED DRAFT RULE 408 COMMUNICATION." *See* Bair Decl. ¶ 9.

36.  Ms. Rabinowitz did not provide any assurance, at any point, to either DOL or Century that Ms. Rabinowitz would keep the draft Abatement Plan Agreement private or secret. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. As counsel to United Steelworkers, Ms. Rabinowitz was required to keep the draft Abatement Plan Agreement confidential because her client Mike Wright, Director of Health, Safety & Environment of the United Steelworkers, represented to Century that the United Steelworkers would keep the draft Abatement Plan Agreement confidential and share it only with its "beryllium team," which included Ms. Rabinowitz. *See* Harbath Decl. ¶ 31, Attch. A.

37.    The draft Abatement Plan Agreement that Ms. Rabinowitz received came directly from OSHA's counsel as a result of Ms. Rabinowitz's communications with OSHA. *Id.* ¶ 8. It did not come to Ms. Rabinowitz from Mike Wright, who was then Director of Health, Safety & Environment of the United Steelworkers. *Id.*

3

**DEFENDANT'S RESPONSE**: Disputed. Before OSHA, through counsel, provided Ms. Rabinowitz with part of the draft Abatement Plan Agreement, OSHA's counsel stated that she was "waiting to hear back from Century on which parts of the abatement plan and other guidance we can share." Rabinowitz Decl. ¶ 6; *see* Pl's Statement of Material Fact ("Pl's SMF") ¶ 33; Baird Decl. ¶ 8, Ex. 3.

38. Century never requested that Ms. Rabinowitz keep the draft Abatement Plan Agreement she received from OSHA private or secret. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. As counsel to United Steelworkers, Ms. Rabinowitz was required to keep the draft Abatement Plan Agreement confidential because her client Mike Wright, Director of Health, Safety & Environment of the United Steelworkers, represented to Century that the United Steelworkers would keep the draft Abatement Plan Agreement confidential and share it only with its "beryllium team," which included Ms. Rabinowitz. *See* Harbath Decl. ¶ 31, Attch. A.

39. By email on October 13, 2020, Ms. Rabinowitz explained to counsel for Century that "the contents of earlier drafts of the agreement are known to USW" and that USW "cannot agree to make that information confidential retroactively." *See* Harbath Decl., Attachment B; Rabinowitz Decl. ¶ 9.

**DEFENDANT'S RESPONSE**: Undisputed that Ms. Rabinowitz made these statements via email to counsel for Century on October 13, 2020. Disputed as to the fact that the earlier drafts of the agreement were not confidential. Ms. Rabinowitz understood that United Steelworkers was only being provided copies of drafts of the Abatement Plan Agreement on the condition of confidentiality, and that such drafts were being shared because Century viewed United Steelworker's as "critical[ly] important[t] to the resolution of the litigation over the Beryllium

4

standard" between Century and OSHA. *See* Harbath Decl. ¶ 31, Attch. A; Baird Decl. ¶ 5. In addition, the draft Abatement Plan provided to Ms. Rabinowitz was labeled as a draft and marked as "CONFIDENTIAL TREATMENT REQUESTED DRAFT RULE 408 COMMUNICATION." *See* Bair Decl. ¶ 9.

40. That there were no confidentiality restrictions on the draft Abatement Plan Agreement that Ms. Rabinowitz received from OSHA was confirmed when Century's counsel stated by email on October 14, 2020, that Century did not "intend to now place restrictions on USW's discussions regarding the contents of the draft settlement agreements to the extent such discussions do not confirm what is or isn't actually in the executed settlement agreement itself." Rabinowitz Decl. ¶ 10 (*quoting* Harbath Decl., Attachment B).

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument not a statement of fact. In addition, this statement is not supported by the part of the record cited as it misconstrues the record. The email from Century's counsel to Ms. Rabinowitz on October 14, 2020 is discussing the terms of the confidentiality agreement that United Steelworkers and Century are negotiating, which would allow United Steelworkers to view the final abatement plan. Thus, Century's counsel is explaining to Ms. Rabinowitz that if United Steelworkers is willing to enter into a confidentiality agreement to view the final abatement plan, Century will not prohibit United Steelworkers from discussing "the contents of the draft settlement agreements to the extent such discussions do not confirm what is or isn't actually in the executed settlement agreement itself." Because the parties never entered into a confidentiality agreement to allow United Steelworkers to view the final abatement plan, this email is irrelevant. *See* Harbath Decl. ¶ 32, Ex. B.

5

41. Century did not assert that the contents of the draft Abatement Plan Agreement were confidential information and requested confidentiality only over the terms of their executed agreement. Rabinowitz Decl. ¶ 10.

**DEFENDANT'S RESPONSE**: Disputed. Ms. Rabinowitz understood that United Steelworkers was only being provided copies of drafts of the Abatement Plan Agreement on the condition of confidentiality, and that such drafts were being shared because Century viewed United Steelworker's as "critical[ly] important[t] to the resolution of the litigation over the Beryllium standard" between Century and OSHA. *See* Harbath Decl. ¶ 31, Attch. A; Baird Decl. ¶ 5. In addition, the draft Abatement Plan provided to Ms. Rabinowitz was labeled as a draft and marked as "CONFIDENTIAL TREATMENT REQUESTED DRAFT RULE 408 COMMUNICATION." *See* Bair Decl. ¶ 9. In addition, the second part of this statement is also disputed to the extent it refers back to the email from Century's counsel to Ms. Rabinowitz on October 14, 2020, which discusses the terms of the confidentiality agreement that United Steelworkers and Century are negotiating, and which would allow United Steelworkers to view the final abatement plan. In that email, Century's counsel is explaining to Ms. Rabinowitz that if United Steelworkers is willing to enter into a confidentiality agreement to view the final abatement plan, Century will not prohibit United Steelworkers from discussing "the contents of the draft settlement agreements to the extent such discussions do not confirm what is or isn't actually in the executed settlement agreement itself." Because the parties never entered into a confidentiality agreement to allow United Steelworkers to view the final abatement plan, this email is irrelevant. *See* Harbath Decl. ¶ 32, Ex. B.

42. The draft Abatement Plan Agreement contains general descriptions of standard engineering and work practice controls that are routinely used to comply with OSHA standards,

such as by improving ventilation through recommendations from an outside engineering firm or by installing certain equipment. *Id.* ¶ 11.

**DEFENDANT'S RESPONSE**: Disputed. *See* Harbath Dec. ¶¶ 14–15. The part of the record cited also refers only to Ms. Rabinowitz' characterization of the draft Abatement Plan Agreement, which is disputed by the fact that Plaintiff's own FOIA request acknowledges that the Abatement Plan Agreement was part of records "relating to Century Aluminum's compliance obligations with the Beryllium standard" and specifically sets forth "requirements for Century to comply with OSHA's Beryllium standard." *See* Compl., ECF No. 1 ¶¶ 5, 6.

43. The information contained in the draft Abatement Plan Agreement is not customarily kept private or secret. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument not a statement of fact. In any event, it is also contradicted by the record. *See* Harbath Decl. ¶ 31.

44. Indeed, the descriptions of the controls and measures identified in the draft Abatement Plan Agreement are similar to the descriptions of such controls and measures that OSHA usually includes in its assessment of a standard's technological feasibility, which is publicly available in the Federal Register. *Id.*

**DEFENDANT'S RESPONSE**: Disputed and immaterial. This is a legal argument, not a statement of fact. In addition, the part of the record cited refers only to Ms. Rabinowitz' characterization of the draft Abatement Plan Agreement, which is disputed by the fact that Plaintiff's own FOIA request acknowledges that the Abatement Plan Agreement was part of records "relating to Century Aluminum's compliance obligations with the Beryllium standard" and specifically sets forth "requirements for Century to comply with OSHA's Beryllium standard." *See* Compl. ¶¶ 5, 6.

45. Furthermore, the draft Abatement Plan Agreement references requirements set forth in a Clean Air Act permit issued by a state agency—not information that is private or secret. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. Although the draft Abatement Plan referenced state Clean Air Act regulations, the draft only referenced this act to explain what measures, when implemented, in the Abatement Plan will bring Century into compliance with requirements set forth in that Clean Air Act; the draft does not detail the actual requirements of that law. *See* Supp. Declaration of Dennis Harbath ("Harbath Supp. Decl.") ¶ 5.

46. Ms. Rabinowitz was told by OSHA's counsel that there are only minor changes between the draft Abatement Plan Agreement that was made available to Ms. Rabinowitz and the final Abatement Plan Agreement executed between OSHA and Century. *Id.* ¶ 12.

**DEFENDANT'S RESPONSE**: Disputed to the extent that OSHA's counsel stated that "not much changed" from the drafts that OSHA counsel sent Ms. Rabinowitz in April 2018, "but there were some changes." *See* Baird Decl. ¶ 10, Ex. 4.

**The FOIA Request, Response, and Administrative Appeal**

47. On November 18, 2020, DOL requested by email that Plaintiff "revise [its FOIA] request to ask only for the final abatement plan agreement between Century Aluminum and OSHA" that was part of the settlement agreement between Century and OSHA that settled Century's petition for review of the beryllium standard in the Eighth Circuit Court of Appeals. *See* Keen Decl., Ex. 3.

**DEFENDANT'S RESPONSE**: Disputed to the extent that DOL's November 18, 2020 email did not "request," but only "suggest[ed]" that Plaintiff revise its FOIA request. *See* Keen Decl., Ex. 3. Otherwise, undisputed.

8

48. On January 13, 2021, DOL produced a single record in response to Plaintiff's request: the "Abatement Plan Agreement" between Century and OSHA. Keen Decl., Ex. 2. In its final response letter, DOL stated that the produced record was "the final abatement plan contained in the agreement between Century Aluminum and OSHA settling Century Aluminum's 8th Circuit challenge to the beryllium standard." *Id.*

**DEFENDANT'S RESPONSE**: Disputed to the extent that the January 13, 2021 letter produced a single record described as "the final abatement plan contained in the agreement between Century Aluminum and OSHA settling Century Aluminum's 8th Circuit challenge to the beryllium standard." *See* Keen Decl., Ex. 2; Pl's SMF ¶ 55. Otherwise undisputed.

49. Asserting FOIA exemption 4, DOL redacted from the record the terms setting forth the requirements that OSHA determined Century would have to follow to comply with the beryllium standard. *See* Keen Decl., Ex. 2; Rabinowitz Decl. ¶ 14.

**DEFENDANT'S RESPONSE**: Undisputed.

50. The record that was produced by DOL withholds information about Century's compliance obligations under paragraphs (f)(2), (j)(1)(i), and (j)(2)(i)-(ii) of the beryllium standard—that is, the requirements for engineering and work practice controls and housekeeping measures under the beryllium standard. *See* Keen Decl., Ex. 2; Rabinowitz Decl. ¶ 14.

**DEFENDANT'S RESPONSE**: Undisputed.

51. The produced record redacts in their entirety the terms by which Century satisfies the requirements for engineering and work practice controls and housekeeping measures under the beryllium standard. *See* Keen Decl., Ex. 2; Rabinowitz Decl. ¶ 14.

**DEFENDANT'S RESPONSE**: Undisputed.

9

52. On February 1, 2021, Plaintiff submitted an administrative appeal that challenged DOL's withholding of information on the asserted basis of FOIA exemption 4. See Keen Decl., Ex. 4; Rabinowitz Decl. ¶ 15.

**DEFENDANT'S RESPONSE**: Undisputed.

53. On February 22, 2021, DOL acknowledged by letter receipt of the administrative appeal. The letter acknowledged that the appeal was submitted on February 1, 2021, and that the appeal was assigned tracking number 2021-A-0071. Rabinowitz Decl. ¶ 16 & Ex. 1.

**DEFENDANT'S RESPONSE**: Disputed to the extent that the part of the record cited does not support the purported fact.

54. DOL did not provide a response to the administrative appeal within the statutory deadline provided under FOIA. *See id.* ¶ 17; *see also* 5 U.S.C. § 552(a)(6)(A)(ii). DOL neither made a final determination on the appeal, nor did it produce any of the information it had redacted under the asserted basis of FOIA exemption 4. Rabinowitz Decl. ¶ 17.

**DEFENDANT'S RESPONSE**: Undisputed.

**The Abatement Plan Agreement**

55. The Abatement Plan Agreement is part of the settlement agreement between Century and OSHA that settled Century's petition for review of the beryllium standard in the United States Court of Appeals for the Eighth Circuit. *See* Keen Decl., Ex. 2; Keen Decl. ¶ 8.

**DEFENDANT'S RESPONSE**: Undisputed.

56. The Abatement Plan Agreement is "Appendix D" to the settlement agreement between Century and OSHA. Keen Decl., Ex. 2.

**DEFENDANT'S RESPONSE**: Undisputed.

57. The Abatement Plan Agreement sets forth alternative methods that Century may use to comply with OSHA's beryllium standard with respect to engineering and work practice controls and housekeeping measures. *Id.* (citing paragraphs (f)(2), (j)(1)(i), and (j)(2)(ii)-(ii) of the beryllium standard for general industry, 29 C.F.R. § 1910.1024); *see also* Keen Decl. ¶ 9.

**DEFENDANT'S RESPONSE**: Disputed. The Abatement Plan Agreement does not set forth "alternative methods" for Century to comply with OSHA's Beryllium Standard, nor does the part of the record cited support this purported fact. *See* Keen Decl. ¶ 9, Ex 2. Otherwise, undisputed.

58. OSHA agreed to the terms set forth in the Abatement Plan Agreement. Keen Decl., Ex. 2; *see also* Keen Decl. ¶¶ 8, 9.

**DEFENDANT'S RESPONSE**: Undisputed.

59. The information redacted from the Abatement Plan Agreement reflects OSHA's decision, based on its own analysis of the adequacy of Century's proposed abatement plans, regarding the terms by which Century would satisfy the beryllium standard. *See* Keen Decl., Ex. 2; *see also* Keen Decl. ¶ 9.

**DEFENDANT'S RESPONSE**: Disputed. This purported fact misstates the record, which speaks for itself. Specially, the Abatement Plan contains, "for each location, a series of engineering and work practice controls, including housekeeping measures, that OSHA and Century Aluminum agreed would constitute compliance with certain provisions in the Beryllium standard for General Industry[.]" *See* Keen Decl. ¶ 9. The Abatement Plan Agreement also states,

> In light of the foregoing statements *by Century*, provided that Century also fully complies with the exposure assessment provisions of paragraph (d) and provides respiratory protection in accordance with paragraph (g), OSHA has determined that compliance with the terms of Abatement Plans 1, 2, and 3 below, would satisfy Century's obligations with respect to

11

paragraphs (f)(2), (j)(1)(i), and (j)(2)(i)-(ii) of the Beryllium Standard for General Industry, 29 C.F.R. § 1910.1024, in Hawesville, Sebree, and Mt. Holly, respectively.

*See id.*, Ex. 2.

60. OSHA did not provide any assurance to Century that it would keep the information contained in the Abatement Plan Agreement private or secret. *See* Keen Decl., Ex. 2 at 1 n.1 (stating that "OSHA will evaluate Century's designation [of confidentiality] in accordance with 29 C.F.R. § 70.26 and applicable law should it receive a request for this information under the Freedom of Information Act").

**DEFENDANT'S RESPONSE**: Disputed. The part of the record cited does not support the purported fact, because 29 C.F.R. §70.26 states that "[c]onfidential commercial information will be disclosed under the FOIA only in accordance with this section and Executive Order 12,600" thus by following that standard, OSHA is affirming it will process the material as commercial information. *See* Keen Decl. Ex. 2. In addition, OSHA did provide assurances to Century that it would keep the information contained in the Abatement Plan Agreement private or secret. *See* Harbath Decl. ¶ 20; Baird Decl. ¶ 10.

**Abatement Plans and Settlement Agreements**

61. Information defining a company's compliance obligations under an OSHA standard, rule, or regulation is not information that is customarily kept private or secret. Rabinowitz Decl. ¶ 20.

**DEFENDANT'S RESPONSE**: Disputed. This is an unsupported opinion testimony and legal argument, not a statement of fact.

62. To the contrary, information setting forth the measures by which a company satisfies an OSHA standard, rule, or regulation—included in variance orders, abatement plans, and

12

settlement agreements with OSHA—has routinely been released by OSHA and other companies in the past. *Id.*

**DEFENDANT'S RESPONSE**: Disputed as to the term "routinely," for vagueness and unsupported opinion testimony, otherwise undisputed. *See* OSHA's Variance Program, Department of Labor, https://www.osha.gov/variance-program (last visited Mar. 25, 2022); Corporate-Wide Settlement Agreements, Department of Labor, https://www.osha.gov/enforcement/cwsa (last visited Mar. 25, 2022).

63. For example, pursuant to section 6(d) of the OSH Act, an employer may obtain a variance from an OSHA standard—i.e., permission to deviate from the requirements of an OSHA standard under specified conditions. *Id.* ¶ 21; *see also* 29 U.S.C. § 655(d); 29 C.F.R. Part 1905.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. Section 6(d) of the OSH Act and the cited regulation speak for themselves.

64. Any variance, like the Abatement Plan Agreement, "shall prescribe the conditions the employer must maintain, and the practices, means methods, operations, and processes which he must adopt." 29 U.S.C. § 655(d); 29 C.F.R. Part 1905; Rabinowitz Decl. ¶ 21.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. Section 6(d) of the OSH Act and the cited regulation speak for themselves.

65. The terms of a variance order—which sets forth OSHA's decision of the terms and conditions by which an employer is permitted to deviate from an OSHA standard—are required by regulation to made publicly available in the Federal Register. See 29 C.F.R. § 1905.6 (stating that "[e]very final action granting a variance… shall be published in the Federal Register" and that "[e]very such final action shall specify the alternative to the standard involved which the particular variance permits"); see also Rabinowitz Decl. ¶ 21.

13

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The OSH Act and the cited regulation speak for themselves.

66. The Abatement Plan Agreement negotiated between Century and OSHA is, as a practical matter, the equivalent of a permanent variance from the beryllium standard. Rabinowitz Decl. ¶ 21.

**DEFENDANT'S RESPONSE**: Disputed. This is an unsupported opinion testimony and legal argument, not a statement of fact. In any event, the record disputes the purported fact, as the Abatement Plan Agreement contains measures "that OSHA and Century Aluminum agreed would constitute compliance with certain provisions in the Beryllium standard for General Industry" not a variance or deviation from that standard. *See* Keen Decl. ¶ 9.

67. Abatement plans and settlement agreements with OSHA are not customarily or actually kept private or secret. *Id.* ¶ 22.

**DEFENDANT'S RESPONSE**: Disputed. This is an unsupported opinion testimony and legal argument, not a statement of fact.

68. A settlement agreement between OSHA and an employer that settles a citation issued by OSHA for the employer's violation of an OSHA standard, rule, or regulation typically includes an abatement plan. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. This is unsupported opinion testimony and legal argument, not a statement of fact.

69. An "abatement plan" sets forth the requirements that an employer needs to follow to come into compliance with an OSHA standard, rule or regulation. *Id.*

**DEFENDANT'S RESPONSE**: Undisputed.

14

70. In Ms. Rabinowitz's experience, the abatement plan has always been shared with the affected workers without any restrictions. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. This is unsupported opinion testimony and legal argument, not a statement of fact; and is otherwise immaterial.

71. On its website, OSHA has publicly posted its settlement agreements with over thirty different employers that had violated OSHA standards, rules, or regulations. *See* Corporate-Wide Settlement Agreements, OSHA, https://www.osha.gov/enforcement/cwsa; *see also* Rabinowitz Decl. ¶ 23.

**DEFENDANT'S RESPONSE**: Undisputed.

72. One of the settlement agreements that OSHA posted on its website is its settlement with Republic Steel. *See* Corporate-Wide Settlement Agreements, OSHA, https://www.osha.gov/enforcement/cwsa; see also Rabinowitz Decl. ¶ 23 & Ex. 3. The settlement agreement and its appendices, which are publicly available without any redactions, identify measures and controls for Republic Steel to abate the safety or health hazard that violated the OSH Act, as well as the deadlines for Republic Steel to complete certain abatement tasks. Rabinowitz Decl. ¶ 23 & Ex. 3 at 6–9 & Appendix A.

**DEFENDANT'S RESPONSE**: Disputed to the extent the settlement agreement speaks for itself. Otherwise, undisputed.

73. According to Ms. Rabinowitz, in her over forty years of experience as an attorney in occupational safety and health law, she has never encountered a situation (other than with Century) where a company has kept secret its compliance obligations under an OSHA standard, rule or regulation. *Id.* ¶ 24.

15

**DEFENDANT'S RESPONSE**: Disputed. This is unsupported opinion testimony and legal argument, not a statement of fact; and is otherwise immaterial.

74. Other than in this case with Century, the company or OSHA has always disclosed to Ms. Rabinowitz an unredacted copy of the company's abatement plan and settlement agreement with OSHA. *Id.*

**DEFENDANT'S RESPONSE**: Disputed. This is unsupported opinion testimony and legal argument, not a statement of fact; and is otherwise immaterial.

## The Written Exposure Control Plan

75. Century is required by law to disclose to all of its employees who may be exposed to airborne beryllium a "written exposure control plan" that contains information regarding its engineering and work practice controls and housekeeping measures under the beryllium standard. 29 C.F.R. § 1910.1024(f)(1)(iii) (stating that an "employer must make a copy of the written exposure control plan accessible to each employee who is, or can reasonably be expected to be, exposed to airborne beryllium"); Rabinowitz Decl. ¶ 25.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The Beryllium standard speaks for itself.

76.    The beryllium standard also requires that the authorized representative of the employees have access to the plan. 29 C.F.R. § 1910.1020(e), incorporated by reference in 29 C.F.R. § 1910.1024(f)(1)(iii)); Rabinowitz Decl. ¶ 25.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The Beryllium standard speaks for itself.

77.    Century is required to train employees on the written exposure control plan and "ensure that each employee who is, or can reasonably be expected to be, exposed to airborne

16

beryllium can demonstrate knowledge and understanding" of the plan. 29 C.F.R. § 1910.1024(m)(4)(ii)(B); Rabinowitz Decl. ¶ 26.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The Beryllium standard speaks for itself.

78.    The written exposure control plan must contain information regarding Century's engineering and work practice controls and housekeeping requirements under the beryllium standard. *See* 29 C.F.R. § 1910.1024(f)(1)(i)(G) (stating that the written exposure control plan "must contain" "[a] list of engineering controls, work practices, and respiratory protection required by paragraph (f)(2) of this standard"); *see also id.* § 1910.1024(f)(1)(E) (stating that the written exposure control plan "must contain" "[p]rocedures for keeping surfaces as free as practicable of beryllium"); Rabinowitz Decl. ¶ 27.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The Beryllium standard speaks for itself.

79.    The Abatement Plan Agreement between Century and OSHA does not exempt Century from its requirement to maintain the written exposure control plan and disclose it to its employees. *See* Keen Decl., Ex. 2; *see also* Rabinowitz Decl. ¶ 28.

**DEFENDANT'S RESPONSE**: Disputed. This is a legal argument, not a statement of fact. The Abatement Plan Agreement and the Beryllium standard speak for themselves.

80.    Century has over 600 employees and contractors at its Hawesville facility, over 720 employees and contractors at its Sebree facility, and over 350 employees and contractors at its Mt. Holly facility. *See* Harbath Decl. ¶¶ 22–24.

**DEFENDANT'S RESPONSE**: Undisputed.

17

Dated: March 25, 2022                     Respectfully submitted,

                                          MATTHEW M. GRAVES, D.C. Bar. #481052
                                          United States Attorney

                                          BRIAN P. HUDAK
                                          Acting Chief, Civil Division

                                          By: */s/ Anna D. Walker*
                                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                              ANNA D. WALKER
                                              Assistant United States Attorney
                                              555 Fourth Street, NW
                                              Washington, DC 20530
                                              202-252-5244
                                              anna.walker@usdoj.gov

                                          *Attorneys for the United States of America*

18