## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**OCCUPATIONAL SAFETY & HEALTH**
**LAW PROJECT, PLLC,**

*Plaintiff,*

v.                                                    **Case No. 1:21-cv-2028-RCL**

**U.S. DEPARTMENT OF LABOR,**

*Defendant,*

and

**CENTURY ALUMINUM COMPANY,**

*Intervenor-Defendant.*

### MEMORANDUM OPINION

This case concerns the extent to which an agency can keep the details of a settlement agreement with a private company secret. In 2020, the Occupational Safety and Health Administration ("OSHA") resolved a legal challenge by Century Aluminum Company ("Century") to OSHA's final rule protecting workers from beryllium exposure. OSHA approved a settlement agreement with Century that details abatement plans and housekeeping measures to limit beryllium exposure at three of Century's smelting facilities. The agreement includes measures developed by Century and approved by OSHA in Appendix D to the settlement agreement, titled Abatement Plan Agreement for Century Aluminum Company ("Abatement Plan Agreement"). When the Occupational Safety & Health Law Project, PLLC ("OSHLP"), filed a Freedom of Information Act ("FOIA") request for the Abatement Plan Agreement, OSHA provided a redacted version withholding the measures. The government argues that those omitted details are commercial, confidential, and obtained from Century—meeting FOIA Exemption 4's

1

requirements. After considering the record, applicable law, the parties' briefing, and conducting *in camera* review of the unredacted Abatement Plan Agreement, this Court will **GRANT IN PART and DENY IN PART** the Department of Labor's motion for summary judgment and **DENY** OSHLP's cross-motion for summary judgment.

## I.     BACKGROUND

OSHA, an agency within the auspices of the Department of Labor, is tasked with "ensuring safe and healthful working conditions for workers." Decl. Stanley E. Keen ("Keen Decl.") ¶ 5, ECF No. 17-3. To that end, OSHA published a final rule establishing standards for occupational exposure to beryllium and beryllium compounds. *Id.* at ¶ 6; 82 Fed. Reg. 2470. In 2017, that rule drew a legal challenge from Century, "a global primary aluminum producer" that operates three domestic aluminum smelting facilities across Kentucky and South Carolina. Decl. Dennis Harbath ("Harbath Decl.") ¶ 3, ECF No. 17-4; Keen Decl. ¶ 7. OSHA and Century subsequently entered negotiations to settle Century's lawsuit. *See* Decl. Randy Rabinowitz ("Rabinowitz Decl.") ¶ 5, ECF No. 22-1.

In the meantime, United Steelworkers, through counsel Randy Rabinowitz, intervened to oppose Century's challenge and communicated with OSHA about the government's potential settlement with Century. *See id.* As part of those communications, Ms. Rabinowitz received part of a draft of the settlement agreement. *Id.* at ¶ 6. That portion contained a draft abatement plan for Century's two Kentucky locations. *Id.*; Decl. Edmund C. Baird ("Baird Decl.") ¶ 8, ECF No. 28-1. OSHA's counsel sent that draft plan to Ms. Rabinowitz without redaction and after first checking with Century about what parts of the plan might need to be withheld. Rabinowitz Decl. ¶ 6; Baird Decl. ¶ 7. Rabinowitz was not asked to keep the agreement confidential by OSHA's attorney, although a director at United Steelworkers had made earlier assurances of confidential treatment—directly to Century—for documents that the director would be sharing with his team,

including Ms. Rabinowitz specifically.  Rabinowitz Decl. ¶ 8; ECF No. 17-3 at 46–47.  Ms. Rabinowitz represents that, based on her conversations with OSHA's counsel, "[she] was led to believe that there were only minor changes between the draft abatement plan agreement that was made available to [her] and the final Abatement Plan Agreement."  Rabinowitz Decl. ¶ 12; *see also* ECF No. 28-2 at 10 ("I will say, not much changed after the drafts that [OSHA's attorney] sent you in April of 2018, but there were some changes.").

In 2020, Century and OSHA entered into a final settlement agreement.  Keen Decl. ¶ 8. Appendix D of the settlement agreement contains the final version of that abatement plan, the Abatement Plan Agreement. Pl.'s Compl. 8.  The Abatement Plan Agreement consists of "a series of engineering and work practice controls, including housekeeping measures, that OSHA and Century Aluminum agreed would constitute compliance with certain provisions in the Beryllium standard for General Industry, if implemented," and which Century in fact agreed to implement as part of its settlement with OSHA. Keen Decl. ¶ 9.  The Abatement Plan Agreement explains that "OSHA has determined that compliance with the terms of Abatement Plans 1, 2, and 3 [specified in the Abatement Plan Agreement], would satisfy Century's obligations [under the occupational exposure to Beryllium final rule]." Pl.'s Compl. 8.  The Abatement Plan Agreement also explains that Century believes the items contained therein to be "confidential commercial information as that term is defined in 29 C.F.R. § 70.26(b)." *Id.* at 8 n.1.

OSHLP, through its Executive Director Randy Rabinowitz, subsequently filed a FOIA request seeking documents and communications related to Century and the challenged Beryllium rule. Pl.'s Compl. ¶ 5.  That request was then limited by agreement "to request only 'the final abatement plan for Century Aluminum.'" *Id.* at ¶ 8.  The Department of Labor provided the final document, albeit with redactions of both "the abatement plans for each of Century Aluminum's

three locations" as well as the housekeeping schedules for the three facilities. *Id.* at 6–22; Keen Decl. ¶ 15.

All details related to Century's plans, as approved by OSHA, were redacted under FOIA Exemption 4, which allows for the withholding of "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." Keen Decl. ¶ 15; *see* 5 U.S.C. § 552(b)(4). After initiating an administrative appeal of the Department's decision, but before receiving a response, OSHLP filed this lawsuit challenging Exemption 4's applicability to the Abatement Plan. Pl.'s Compl. The Department of Labor moved for summary judgment. Def.'s Mot., ECF No. 17; Def.'s Mem. in Supp. ("Def.'s Mem."), ECF No. 17-1. OSHLP filed a cross-motion for summary judgment and opposed the Department's motion for summary judgment. Pl.'s Mot., ECF No. 22; Pl's Mem. in Supp. ("Pl.'s Mem."), ECF No. 22. The Department filed a reply in support of its summary judgment motion and opposition to OSHLP's cross-motion for summary judgment. Def.'s Reply, ECF No. 27. And finally, OSHLP replied. Pl.'s Reply, ECF No. 29. This Court ordered the Department of Labor to provide an unredacted version of the Abatement Plan Agreement *ex parte* for *in camera* inspection, which the Department provided in sealed form on the docket. ECF No. 32.[1]

## II.    LEGAL STANDARDS

FOIA allows the general public to request release of records from government agencies. 5 U.S.C. § 552. The statute contains a "strong presumption in favor of disclosure." *Am. C.L. Union v. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). Nevertheless, the exemptions that Congress included in FOIA's

---

[1] No statement or conclusion in this opinion should be understood as revealing, or describing, the contents of the unredacted record except where this Court has explicitly stated so.

statutory foundation "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (alternations omitted) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)). Thus, courts must take careful note of FOIA's exemptions and refrain from expanding or restricting them beyond their plain terms. *See id.* At the same time, the burden is on the government to prove "that it has not improperly withheld" information requested under FOIA. *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 99 (D.D.C. 2019) (internal quotation marks omitted) (quoting *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 922 F.3d 480, 487 (D.C. Cir. 2019)). Thus, the government must always demonstrate that it has properly invoked the exemption relied upon and the "burden does not shift even when the requester files a cross-motion for summary judgment." *Id.*

Courts routinely settle FOIA disputes at the summary judgment stage. *See Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in the original). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law," *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006), and genuine "if the nonmovant presents evidence such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Doe v. Exxon Mobil Corp.*, No. 1:01-cv-1357 (RCL), 2022 WL 3043219, at *7 (D.D.C. Aug. 2, 2022) (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248). The Court must "view the evidence in the light most favorable to" the nonmoving party. *Holcomb*, 433 F.3d at 895.

In a FOIA case, summary judgment may be granted in favor of an agency based on government declarations supporting invocation of a FOIA exemption, provided that they (1) "describe the documents and the justifications for nondisclosure with reasonably specific detail," (2) "demonstrate that the information withheld logically falls within the claimed exemption," and (3) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The standard does not demand more than "an agency[] justification for invoking a FOIA exemption . . . [that] appears logical or plausible." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)); *see also Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) ("Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail.").

Thus, the Department of Labor must "demonstrate[] that the information redacted from the [Abatement Plan Agreement] . . . logically falls within Exemption 4 of FOIA." *See S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 66 (D.D.C. 2012) (citing *Am. C.L. Union v. Dep't of Def.*, 628 F.3d 612, 618 (D.C. Cir. 2011)). If there is a genuine issue of fact as to whether the government can show that Exemption 4 applies to the withheld information, then summary judgment will be inappropriate. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1118 (D.C. Cir. 2007) (affirming a denial of summary judgment when there was a "genuine issue of fact as to the applicability of [the relevant FOIA exemption]"). The requester's burden on its cross-motion for summary judgment is to show "the absence of material factual issues before a summary disposition of the case could permissibly occur." *Ctr. for Investigative Reporting*, 436 F. Supp.

3d at 99 (internal quotation marks omitted) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

## III.   DISCUSSION

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." *See* 5 U.S.C. § 552(b)(4). The Department of Labor does not assert that the information here involves trade secrets. Therefore, it must demonstrate that the withheld information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 108 (quoting *Public Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). OSHLP challenges the government's argument for each requirement and the Court will take each in turn.

### A.  The Redacted Information Is Commercial

"[T]he question of whether information is 'commercial' boils down to a common sense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Public Citizen Health Rsch. Grp.*, 704 F.2d at 1290). This covers more than just "records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.'" *Baker & Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (ellipsis in the original) (quoting *Pub. Cit. Health Rsch. Grp.*, 704 F.2d at 1290). Instead, Exemption 4 extends beyond "revenue, net worth, income, and EBITDA" to broadly cover "when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler*, 473 F.3d at 319; *Jud. Watch v. Dep't of Health & Hum. Servs.*, 525 F. Supp. 3d 90, 96 (D.D.C. 2021) (quoting *Public Citizen v. Dep't of Health & Hum. Servs.*, 975 F. Supp. 2d 81, 99 (D.D.C. 2013) ("*Public Citizen I*")). For example, letters opining on the "market conditions for domestic companies" were found to be commercial information when "disclosure would help rivals to identify and exploit [the

submitting] companies' competitive weaknesses." *Baker & Hostetler*, 473 F.3d at 320. "In another case, the D.C. Circuit found that 'documentation of the health and safety experience of [a company's] products' was commercial because such documentation was 'instrumental in gaining marketing approval for their products.'" *100Reporters LLC v. Dep't of Just.*, 248 F. Supp. 3d 115, 134 (D.D.C. 2017) ("*100Reporters I*") (alternation in the original) (quoting *Public Citizen Health Rsch. Grp.*, 704 F.2d at 1290).

The Department of Labor argues that the redacted information included in the Abatement Plan Agreement is commercial because it contains "Century's measures for reducing employee's beryllium exposure." Def.'s Mem. 9. That is, it includes valuable and costly procedures designed by Century. *See id.* As one of Century's plant managers explains in his declaration, these compliance methods were developed by the firm with an eye toward efficiency: the more efficient the measures, "the less expensive it is to manufacture aluminum and the more competitive the producer is on the market." *Id.* at 10 (citing Harbath Decl. ¶¶ 8–9). In the second quarter of 2021, Century invested approximately $20 million into beryllium exposure abatement, representing "significant costs and efforts to comply with [OSHA's] Beryllium standard." Harbath Decl. ¶ 12. Moreover, in Century's industry, companies compete on process efficiencies and effective compliance with government regulation. *See id.* at ¶¶ 7–19. This withheld information falls squarely within the commercial category under Exemption 4.

In response, OSHLP emphasizes that "design, implementation, and remediation of [a] compliance program is [not] commercial in and of itself." *See New York Times Co.*, No. 19-cv-1424 (KPF), 2021 WL 371784, at *12 (S.D.N.Y. Feb. 3, 2021); Pl.'s Reply 8–9. It argues that the information regarding Century's methods is not commercial, despite initial appearances, because it has been incorporated into an agreement "defin[ing] Century's *legal* obligations under an OSHA

8

standard." Pl.'s Mem. 32 (emphasis in the original).  Because the redacted information consists of "compliance methods," *id.* at 36, which "*establishes* the company's compliance obligations under the beryllium standard," Pl.'s Reply 9 (emphasis in the original), OSHLP argues the Department cannot show that the information contained within the Abatement Plan Agreement is itself commercial.

Yet, OSHLP's argument falls flat.  In the D.C. Circuit, the government merely needs to demonstrate that Century has "a commercial interest in the information submitted to the agency." *See Baker & Hostetler*, 473 F.3d at 319.  As one court in this district has already explained, "the way th[at] companies implement their compliance programs" can be commercial when the programs are "sufficiently instrumental to the companies' operations." *See 100Reporters I*, 248 F. Supp. 3d at 137 (internal quotation marks omitted) (quoting *Public Citizen v. Dep't of Health & Hum. Servs.*, 66 F. Supp. 3d 196, 208 (D.D.C. 2014) ("*Public Citizen II*")).[2]

Here, the government has demonstrated that the measures created by Century and approved by OSHA are sufficiently related to Century's operations to be of commercial interest.  These methods were developed at great expense and are commercially valuable within the industry. Harbath Decl. ¶¶ 8–19.  The efficiency increase captured by Century's methods is squarely focused on the "income-producing aspects" of its operations—the core of commercial information under Exemption 4.  *See Baker & Hostetler*, 473 F.3d at 319 (quoting *Public Citizen Health Rsch. Grp.*, 704 F.2d at 1290).  Indeed, these are the kinds of "business operations, including compliance programs," that courts in this district have previously concluded are commercial within the definition of Exemption 4.  *See, e.g.*, *100Reporters I*, 248 F. Supp. 3d at 137.  Moreover, the

---

[2] *Contra New York Times Co.*, 2021 WL 371784 at *11 n. 13 (concluding that the Second Circuit's test for commercial information would require a stricter relationship).

commercial nature of this information is further demonstrated by the fact that disclosure would help rivals by providing them a several-million-dollar advantage over Century for developing their own systems. Harbath Decl. ¶ 16. And finally, this Court's *ex parte* review has confirmed that the redacted information contains specific plant-by-plant procedures detailing how Century will comply with OSHA's rule. ECF No. 32 (*ex parte*).

Because Century has a commercial interest in the methods contained within the Abatement Plan Agreement, the government has sufficiently demonstrated that the withheld information is commercial.

### B. The Withheld Information Was Obtained From Century

Information is "obtained from a person," 5 U.S.C. § 552(b)(4), if it was "provided by individuals, corporations, or numerous other entities," and is not "obtained from a person" if it is "generated by the federal government." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 147 (D.D.C. 2013). But this dichotomy is made more complicated when the information is generated by the government based on information outside the government. "The key inquiry [then] is who 'the source of the information [was] in the first instance,' and not necessarily who created the particular document." *Id.* (alteration in the original) (quoting *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 103 (D.D.C. 2008)); *see also S. All. for Clean Energy*, 853 F. Supp. 2d at 67 ("[P]ortions of agency-created records may be exempt if they contain information that was either supplied by a person outside the government or that could permit others to 'extrapolate' such information." (quoting *Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979)). But "when the redacted information—despite relying upon other information obtained from outside the agency—constitutes that agency's own analysis, such information is the agency's information" and is unprotected. *S. All. for Clean Energy*, 853 F. Supp. 2d at 68.

The core dispute between the government and OSHLP is whether the information, developed and given to OSHA by Century, was transformed into government information because the withheld measures were approved by OSHA through negotiation and the final Abatement Plan Agreement.[3]  In this circumstance, involving settlement and discussion, "the key distinction— which will obviously be blurry in many instances—is between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency, such that it is no longer a 'person's' information but the agency's information." *Id.* In short: has the agency taken ingredients from the outside to create a new metaphorical dish, or instead offered tasting notes on another's pre-prepared meal?[4]

The government has shown that the information withheld in the Abatement Plan Agreement was obtained from Century for purposes of Exemption 4.  Century developed the work practices and engineering controls that are represented in the Abatement Plan Agreement.  Harbath Decl. ¶¶ 10–15, 18.  "Century has spent millions of dollars developing the Confidential Provisions and implementing the capital improvements."  Letter from Baruch A. Fellner, Attorney, Gibson,

---

[3] OSHLP also appears to argue that because the requested information would not exist but for governmental negotiation and action, it is unprotected. *See* Pl.'s Mem. 15–16.  But the test here does not depend on whether the government caused the information to be created.  Rather, it focuses on the government's *interactions* with that information. *See, e.g.*, *Pub. Citizen Health Rsch. Grp. v. NIH*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002); *S. All. for Clean Energy*, 853 F. Supp. 2d at 68.

[4] *Compare Phila. Newspapers, Inc. v. Dep't of Health & Hum. Servs.*, 69 F. Supp. 2d 63, 66 (D.D.C. 1999) (rejecting the government's withholding of an audit generated based on raw data from a non-governmental source because it consisted of "analysis [] prepared by the government"), *and In Def. of Animals*, 543 F. Supp. at 103 (concluding that incentive-payment information in a negotiated contract was not obtained from a person because the government never "demonstrated that the contractor was the source of the information in the first instance and not the agency"), *with Gulf & W. Indus.*, 615 F.2d at 530 (concluding that portions of an audit report were obtained from a person when they contained the "actual costs for units produced, actual scrap rates, break-even point calculations and actual cost data" because those portions "contained information supplied" by the outside party or such information "could be extrapolated" (internal quotation marks omitted)), *and S. All. for Clean Energy*, 853 F. Supp. 2d at 68–70 (finding that portions of a final term sheet for a Department of Energy loan "reflect[ing] information developed by [the non-governmental party]" were obtained from a person because they were only "slightly modified through negotiation" or otherwise "incorporated without change into the final term sheets" (internal quotation marks omitted)).

Dunn & Crutcher LLP, to Lee Grabel, Senior Attorney, Office of the Solicitor, ECF No. 17-3 at 43–46. After negotiation, OSHA "determined that compliance with the terms of [the abatement plans], would satisfy Century's obligations" under the Beryllium rule. Pl.'s Compl. 8. The information originated with Century, and OSHA's actions here have not transformed Century's information into governmental information. Therefore, the government has sufficiently demonstrated that the withheld details of the Abatement Plan Agreement were developed by a non-governmental party, incorporated into a governmental document after review, and were not substantially altered by the agency. *See Flyers Rts. Educ. Fund, Inc. v. FAA.*, No. 19-cv-3749 (CKK), 2021 WL 4206594, at *5 (D.D.C. Sept. 16, 2021) (holding that withheld information "created through collaboration by Boeing and FAA" were obtained from a person even though they "contain[ed] FAA comments" because they "would reveal technical data and Boeing's proprietary methods of compliance if released" (internal quotation marks and citations omitted)).

In response, OSHLP relies on two out-of-circuit cases to explain that incorporation of Century's procedures into a settlement agreement between the government and a private party should defeat Exemption 4. Pl.'s Mem. 14–16. In *Bloomberg, L.P. v. Board of Governors of the Federal Reserve System*, the Second Circuit concluded that loan documents created by the Federal Reserve were not obtained from a person because the documents were "generated within a Federal Reserve Bank upon its decision to grant a loan" even though the information originated from private loan applications. 601 F.3d 143, 148–49 (2d Cir. 2010). Similarly, the Southern District of New York has concluded that terms in a final government contract were not obtained from a person because the contract was a final executive action that created the relevant document, even if some of the information also came from outside of the government. *Det. Watch Network v. ICE*, 215 F. Supp. 3d 256, 262–63 (S.D.N.Y. 2016). OSHLP relies on these cases to argue that, even if

the government does merely incorporate and approve of information obtained from an outside party, executive approval transforms that outside information into governmental information. *See* Pl.'s Reply 3–5.   Specifically, OSHLP argues that the withheld information constitutes governmental analysis because OSHA approved Century's procedures as complying with OSHA's rule. *Id.*

But the D.C. Circuit and its district courts rely on a test rooted in the statute's simple text: "obtained from a person." 5 U.S.C. § 552(b)(4). This test asks whether "release of this information would disclose data supplied to the government from a person outside the government." *See Gulf & W. Indus.*, 615 F.2d at 530; *see also In Def. of Animals*, 543 F. Supp. 2d at 103 (explaining that the key question is whether "the [outside party] was the source of the information in the first instance and not the agency"); *Jud. Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (holding that information was obtained from a person when the government "obtained the information from the insurance applicants themselves, commercial lenders for the applicant, or a purchaser of the goods at issue"). When the government has not "substantially reformulated" the information, the information maintains its protection under Exemption 4. *See S. All. for Clean Energy*, 853 F. Supp. 2d at 68. While OSHA approved of Century's designs, the Department has adequately demonstrated that the information sought by OSHLP remains the information provided by Century. Review and approval do not equate to substantial reformulation.

The Department has therefore shown that the withheld information was "obtained from a person" under Exemption 4.

### C. Neither Party Merits Summary Judgment On The Confidentiality Requirement

For many years, the D.C. Circuit applied two different confidentiality tests depending on whether information withheld under Exemption 4 was voluntarily or involuntarily submitted.

*Compare Critical Mass Energy Proj. v. Nuclear Regul. Comm'n*, 975 F.2d 871 (D.C. Cir. 1992) (en banc) (establishing a requirement of a custom of confidentiality for voluntary submissions), *with Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) (describing a "substantial harm" test later applied only to involuntary submissions), *abrogated by Food Mktg. Inst.*, 139 S. Ct. 2356. The *National Parks* test's substantial harm requirement was noticeably more demanding than the *Critical Mass* test. *See Ctr. for Investigative Reporting.*, 436 F. Supp. 3d at 109; *Nat'l Parks*, 498 F.2d at 770. But the Supreme Court rejected *National Parks* in 2019, calling its analysis and test "a relic from a bygone era of statutory construction." *Food Mktg. Inst.*, 139 S. Ct. at 2364 (internal quotation marks and citation omitted). It decried the D.C. Circuit's effort "to afford the *same* statutory term two []radically different constructions" based merely on how the information had been submitted. *Id.* at 2365 (emphasis in the original). And, along the way, the Supreme Court cautioned against any methodology that would have a court adopt, as a matter of policy, the rule that FOIA exemptions should be narrowly construed. *Id.* at 2366. Rather, each exemption must be given its "fair reading." *Id.* (quoting *Encino Motorcars*, 138 S. Ct. at 1142). No more, no less.

After clearing away what is not required, the Supreme Court explored what is. It began with the dictionary definition of confidential, holding that, for purposes of Exemption 4, information must be "private" "secret" "or at least closely held." *Id.* at 2363 (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)). When that general definition is spun out into a legal test, confidentiality requires that "commercial or financial information is both customarily and actually treated as private by its owner." *Id.* at 2366. The Court further noted, without deciding, that information may *also* need to have been "provided to the government under an assurance of privacy." *Id.* But it left that question for another day. *See id.* at 2363. At the very

least, however, confidentiality requires customary and actual treatment of information as private by the owner of the information.[5]

After *Food Marketing Institute*, courts in this district have concluded that *Critical Mass* and its progeny provide the governing standard for assessing confidentiality under Exemption 4. *See, e.g.*, *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 109; *Renewable Fuels Ass'n*, 519 F. Supp. 3d at 12. It is easy to see why. Beyond the general rule that a district court cannot alone disregard its circuit's precedent, *see United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997), the Supreme Court independently expressed approval of *Critical Mass*'s reasoning. *See Food Mktg. Inst.*, 139 S.Ct. at 2365 ("[*Critical Mass*] adhered to a much more traditional understanding of [confidential].") This Court will therefore look to *Critical Mass* and its progeny to supply the rules for determining a custom of confidentiality. Nevertheless, the Court agrees with OSHLP that establishing custom alone is not enough. *See* Pl.'s Mem. 29. As the Supreme Court's language makes clear, the information must be "both customarily *and actually* treated as private by its owner." *Food Mktg. Inst.*, 139 S.Ct. at 2366 (emphasis added). Accordingly, *Critical Mass*, which focuses on the custom of confidentiality, will serve as the foundation. But the Court will also look to how this information was actually treated.

Finally, it is worth reiterating the circumstances required for summary judgment. When the government moves for summary judgment based on government declarations in a FOIA case, it must provide "reasonably specific detail" for its justifications, such "that the information withheld logically falls within the claimed exemption." *Mil. Audit Project*, 656 F.2d at 738.

---

[5] Because this Court concludes that there is a genuine dispute of material fact requiring denial of summary judgment for customary and actual private treatment, it need not resolve whether the government-assurances prong is truly required. The Court will note, however, that no court in this district has found it required, rather than merely relevant. *See Flyers Rts. Educ. Fund,* 2021 WL 4206594 at *7 (collecting cases); *see also Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021).

Moreover, the court must consider whether the declarations are "controverted by either contrary evidence in the record []or by evidence of agency bad faith." *Id.* If the government fails to meet these standards, summary judgment will be inappropriate. Summary judgment for the requester will be appropriate when there is "no genuine issue of material fact" such that "a reasonable [factfinder] could not return a verdict for the [government]" on the propriety of its application of Exemption 4. *See Anderson*, 477 U.S. at 247–248. In other words, the requester's burden on its cross-motion for summary judgment is to show "the absence of material factual issues before a summary disposition of the case could permissibly occur." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 99 (internal quotation marks omitted) (quoting *Pub. Citizen Health Rsch. Grp.*, 185 F.3d at 904–05).

### 1. The Government Has Not Provided Reasonably Specific Detail Demonstrating That The Type Of Information Withheld Is Customarily Treated As Private By Century

Under the *Critical Mass* test, information qualifies as confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." 975 F.2d at 879. That test is "objective" and requires the government to "meet the burden of proving the provider's custom." *Id.* "[I]n assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001). And the fact that a party voluntarily makes disclosures does not defeat confidentiality if they are "protected disclosures of information . . . not made to the general public." *Id.*

A custom does not refer to a *particular instance* of how information has been treated over time, but rather how the submitting party has generally treated *this kind of information* over time. *See Renewable Fuels Ass'n*, 519 F. Supp. 3d at 11; *Lapidus L. Firm, PLLC v. Wash. Metro. Area*

*Transit Auth.*, No. 20-cv-161 (JDB), 2021 WL 6845004, at *3 (D.D.C. Feb. 25, 2021).  The level of generality is categorical treatment, not particular treatment.  For example, in *Renewable Fuels Association*, a FOIA requester sought the identities of refineries petitioning the Environmental Protection Agency for a kind of refinery exemption.  519 F. Supp. 3d at 4.  When determining whether the information was customarily treated as confidential by the submitters, the Court rejected the government's attempt to establish custom by only referencing treatment of the *particular* petition that the government had withheld.  *See id.* at 11.  Instead, the Court looked to how the private party had treated other petitions, noting that "it is difficult to say that" a party which "kept its 2015 petition secret" customarily treats its petitions as secret "while disclosing its 2016 petition."  *Id.*

That reasoning matches this Court's understanding as well.  The government must "meet the burden of proving" Century's custom.  *See Critical Mass Energy Proj.*, 975 F.2d at 879.  This refers to whether the information "*is of a kind* that would customarily not be released to the public by" Century.  *See id.* (emphasis added).  The information here consists of Century's engineering and work practices for limiting exposure to hazardous materials and complying with government regulations.  Information as to how Century customarily treats that kind of information is crucial.

The Court will begin by eliminating the evidence that is largely immaterial to the question of Century's custom.[6]  First, almost all of the Department of Labor's and OSHLP's evidence on confidentiality center on how Century actually handled the particular information here.  That evidence is important later, *see infra* Part III.C.2., but has limited bearing on Century's treatment of this kind of information as a matter of custom.  *See Renewable Fuels Ass'n*, 519 F. Supp. 3d at

---

[6] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

11. Whether Century cares to keep this particular information private or secret does not establish that it more generally treats this kind of information that way.  Second, both Mr. Harbath for the government and Ms. Rabinowitz for OSHLP discuss general practices by the government and industry for this kind of information.  Mr. Harbath provides background on the industry practice, stating, for example, that "[a]luminium producers are extremely tightly guarded in protecting process efficiencies due to the direct and disproportionate impact on profitability."  Harbath Decl. ¶ 9.  In response, Ms. Rabinowitz states that this information is not customarily kept private or secret and that such information is in fact routinely made public.  Rabinowitz Decl.  ¶ 11.  She further attests that that abatement plans like this one are made publicly available by the government and are not kept secret in common practice.  *Id.* at ¶¶ 19–24.  But the test here is not about general custom in the industry, nor by the government.  Rather, the issue is how *Century* customarily treats the information, not how its peers do.  *See Ctr. for Auto Safety*, 244 F.3d at 148 ("[T]he court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information.").  Accordingly, both sides' evidence on this point does little to move the ball on the relevant inquiry—Century's own custom.

The government's main evidence for establishing a custom of confidentiality is the declaration of a Century plant manager, Dennis Harbath.  He states that "Century has no access to its competitors' engineering and work practices that limit worker exposure to beryllium, nor does it share its own practices with its competitors."  Harbath Decl. ¶ 7; *see id.* at ¶ 14 (calling the practices in the Abatement Plan "highly confidential business information").  And Mr. Harbath explains that these practices are incorporated into the Abatement Plan Agreement. *Id.* at ¶ 9.

Of additional relevance to Century's custom, the parties fight over the implications of the requirement for Century to give its employees a "written exposure control plan" with information

similar to the kinds of practices in the Abatement Plan Agreement. *See* Rabinowitz Decl. ¶¶ 25–28; Supp. Decl. Dennis Harbath ¶¶ 3–4, ECF No. 28-3.  Nevertheless, disclosures do not defeat customary confidentiality if they are "protected disclosures of information . . . not made to the general public." *Ctr. for Auto Safety*, 244 F.3d at 148.  The issue is about whether information is "customarily kept private, or at least closely held." *Food Mktg. Inst.*, 139 S. Ct. at 2363.  Mr. Harbath attests that employees, or their designated representative, can view "information regarding Century's engineering and work practice controls and housekeeping measures under DOL's Beryllium standard" only after they are "required to preserve the confidentiality of the plan and will not be permitted to review the document unless he or she commits to doing so." *See* Supp. Decl. Dennis Harbath ¶¶ 3–4.  Rather than posing a problem for the Department, this practice provides direct evidence of Century's custom of keeping this kind of information private or closely held.

Nonetheless, the government has not met its burden on summary judgment to provide the reasonable specificity required.  The record provides an implication that Century customarily keeps this kind of information confidential, but fails to cross the finish line.  At the very least, the government must provide some detail as to how the kind of practices and procedures incorporated into the Abatement Plan Agreement have been treated by Century over time.  And more specifically, the government must explain how the kinds of details in the facility-specific abatement plans and housekeeping schedules are customarily treated as private.  If the information in facility abatement plans is customarily treated differently than the information in housekeeping schedules, then the government must detail the differences and explore whether both are customarily treated as private by Century.  At the same time, OSHLP cannot succeed on summary judgment at this stage.  There is a genuine dispute of material fact as to whether Century

customarily treats the kind of information here as private or secret and thus whether Exemption 4 is indeed applicable to the withheld information. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 111–15.

> ### 2.  The Contrary Evidence That OSHLP Relies On Has Generated A Genuine Dispute As To Whether The Withheld Information Was Actually Treated As Private By Century

The government has come close to satisfying its burden on summary judgment to show that Century actually treated the information as private. However, given the contrary evidence in the record, there is a genuine dispute of material fact requiring denial of summary judgment.

First, the government did submit significant evidence detailing the cautious and deliberate measures Century took to keep its information private. Mr. Harbath attests that, internally, Century kept the Abatement Plan Agreement to a "limited group" consisting of only "Century's top management or supervisory personnel, each of whom had a direct interest in the implementation of, and therefore were given access to, the Abatement Plan." Harbath Decl. ¶ 21. These individuals are "governed by an obligation to protect company confidential information." *Id.* When dealing with outside vendors or contractors, Mr. Harbath attests that "at no time was the Abatement Plan revealed . . . [i]nstead, specific tasks were delegated to separate management personnel to complete isolated tasks and projects without a view to the performance of other abatement work." *Id.* And only a low single-digit percentage of persons were given access to the Abatement Plan Agreement at each facility, *id.* at ¶¶ 22–24, with internal segmentation of the information, *id.* at ¶¶ 24–26. *See Food Mktg. Inst.*, 139 S.Ct. at 2363 (crediting as evidence of confidential treatment "only small groups of employees usually hav[ing] access to" the information withheld under Exemption 4). Mr. Harbath's explanation of Century's deliberate measures to maintain the private nature of this information is evidence of actual confidential treatment by Century.

Then, for outside disclosure, Century points to two occasions demonstrating treatment of this information as confidential.

The first occurred in 2018 during negotiations with OSHA.  In February of that year, Century shared draft documents for the settlement agreement with Michael Wright, Director of Health, Safety and Environment at United Steelworkers. ECF No. 17-3 at 46–47. But Century unambiguously practiced confidentiality, by having its agent inform Mr. Wright that "[t]hese documents are confidential and are for the purposes of settling pending litigation, so I just wanted you to confirm you agree that you/your team will keep them confidential and use them only for purposes of our discussions and discussions with OSHA." *Id.*  Century then required "email confirmation" by Mr. Wright of those conditions before sharing the documents. *Id.* Mr. Wright subsequently replied that he would "live with whatever restrictions you want to put on their dissemination" only requesting that he be allowed to discuss them with a limited subset of people working on beryllium issues, namely two members of his department and "attorney Randy Rabinowitz." *Id.*  Mr. Harbath explains that this information was shared due to the "critical importance" of United Steelworkers to the settlement of the litigation and only after Mr. Wright agreed to keep the information confidential.  Harbath Decl. ¶ 31.

Fast forward to 2020 and Century once again demanded confidential treatment when Century was asked by Ms. Rabinowitz, on behalf of United Steelworkers, to disclose the final Abatement Plan Agreement now requested by OSHLP.  Harbath Decl. ¶ 32; ECF No. 17-3 at 48–52.  When Ms. Rabinowitz rejected Century's conditions of confidentiality, Century refused to share the information OSHLP now requests.  Harbath Decl. ¶ 32; *see* ECF No. 17-3 at 53 (providing details of an early proposed confidentiality agreement between Century and United Steelworkers).

Finally, the withheld document itself evinces confidential treatment by Century. A header on the first page states: "CONFIDENTIAL TREATMENT REQUESTED." Pl.'s Compl. 8. Its first footnote says that "Century designates all the items discussed in this document confidential commercial information" and that "Century claims that this document thus is protected from disclosure under the Freedom of Information Act, and Century requests that this designation remain beyond the ten-year expiration on account of the particular operational and financial sensitivity of the items discussed." *Id.* at 8 & n.1. The housekeeping schedules in particular include "FOIA CONFIDENTIAL" in the top right corner of each page. *See id.* at 16–22.

In opposition, OSHLP points to Ms. Rabinowitz's receipt of part of a draft of the abatement plan agreement in April of 2018. Pl.'s Mem. 21. That draft came into Ms. Rabinowitz's possession via email from an attorney representing OSHA. Rabinowitz Decl. ¶ 6. Before sending the draft, the attorney explained that she was "waiting to hear back from Century on which parts of the abatement plan and other guidance we can share." ECF No. 28-2 at 6. The following day, the attorney sent Ms. Rabinowitz a copy of the draft abatement plan for two facilities, withholding a South Carolina facility where United Steelworkers did not represent workers. Baird Decl. ¶ 8; ECF No. 28-2 at 8. OSHLP argues that this disclosure sinks the Department's claim that Century actually kept the information confidential because OSHA's attorney did not ask Ms. Rabinowitz, in that email exchange, to maintain the confidentiality of the draft abatement plan. Pl.'s Reply 14–16; Rabinowitz Decl. ¶ 7. And the draft abatement plan agreement is particularly important because OSHA's attorney stated over email that "not much changed" between the draft abatement plan agreement given to Ms. Rabinowitz and the Abatement Plan Agreement now at issue. *See* ECF No. 28-2 at 10.

However, the surrounding circumstances belie OSHLP's argument.  For one, the draft includes "CONFIDENTIAL TREATMENT REQUESTED" at the top and similar "Century designates all the items discussed in this document confidential commercial information" and "Century claims that this document thus is protected from disclosure" language as the final agreement.  Baird Decl. ¶ 9.  Next, Century did not directly share the draft agreement.  Rather, OSHA's attorney shared the document after confirmation from Century about what should be shared.  ECF No. 28-2 at 6; Def.'s Reply 17.  Finally, Randy Rabinowitz had been explicitly named in Mr. Wright's February email exchange with Century as someone with whom Mr. Wright would be discussing "any documents" related to the settlement agreement.  ECF No. 17-3 at 46.  Century had asked that Mr. Wright "confirm [that he] agree that you/your team will keep them confidential and use them only for purposes of our discussions and discussions with OSHA."  *Id.* at 47.  Mr. Wright agreed, and stated that he would "like to be able to discuss them with our beryllium 'team'" including "attorney Randy Rabinowitz" and that the team would be "under the same restrictions" he had agreed to "on their dissemination."  *Id.* at 46.

Nevertheless, Ms. Rabinowitz did not directly promise to keep the information confidential.  On this record, there is a genuine dispute of fact as to whether Century approved giving Ms. Rabinowitz the draft abatement plan agreement, without a promise of confidentiality, or if instead Century's approval to send Ms. Rabinowitz the draft was based on Mr. Wright's prior promise of confidentiality.  The former seriously undermines the government's actual confidential treatment argument, the latter does not.

Standing alone, that disclosure would likely not be sufficiently material to overcome the government's other evidence.  Yet, Ms. Rabinowitz's 2020 email exchange with counsel for Century also chips away at the government's assertion regarding actual private treatment by

Century. *See* Rabinowitz Decl. ¶ 10.  For one, Century's counsel stated that, if Century shared the Abatement Plan Agreement with United Steelworkers via Ms. Rabinowitz, it "ha[d] no problem with disclosures to KY Labor or USW's members." ECF No. 17-3 at 49.  On its face, that language strongly suggests that Century would be willing to have details of the Abatement Plan Agreement disclosed to some unknown number of United Steelworkers members.  Furthermore, the record does not reflect Century requiring, as part of the potential disclosure, United Steelworkers to prevent additional disclosures by its members of details shared with them about the Abatement Plan Agreement.[7]  Second, Century's counsel stated that Century did not "intend to now place restrictions on USW's discussions regarding the contents of the draft settlement agreements to the extent such discussions do not confirm what is or isn't actually in the executed settlement agreement itself." *Id.*  Given that the government told Ms. Rabinowitz that "not much changed" between the April 2018 draft agreement and the final agreement, this statement also suggests a lack of actual treatment, by Century, of the information as private. *See* ECF No. 28-2 at 10.  Yet, contradicting these suggestions of lax treatment, Century's counsel explained, in the same email exchange, that the information in the final agreement is "highly sensitive, confidential information, definitive knowledge of which must be confined to the maximum extent practicable." *Id.*

The Court cannot reconcile the conflict between the evidence favorable to OSHLP— suggesting that Century did not actually treat the information as particularly private during the two listed interactions with Ms. Rabinowitz—and the government's contrary evidence that Century took many measures to keep the information private.  Furthermore, the import of these two interactions are themselves subject to varied interpretations on the current record.  Accordingly,

---

[7] Such a requirement may be contained within a confidentiality agreement sent by Century's counsel to Ms. Rabinowitz, but the record does not contain that document. *See* ECF No. 17-3 at 49; *see id.* at 53 (containing an earlier copy of a draft confidentiality agreement).

there is a genuine dispute of material fact such that a reasonable factfinder could conclude Century actually treated the information here as private or secret, or that it did not. Therefore, for the reasons stated above, the Court denies summary judgment to both parties. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 99, 115.

### D. Summary Judgment Is Denied For Foreseeable Harm And Segregability

This Court also denies summary judgment on two remaining issues: (1) foreseeable harm and (2) segregability.

First, foreseeable harm. Under the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, agencies must now satisfy a "foreseeable harm" standard in FOIA cases. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 100, 114. "'[A]n agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption—protected interest' and if the law does not prohibit the disclosure." *Jud. Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) (quoting *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018)). But because the government "ha[s] not established that the withheld information falls within the scope of Exemption 4," it has failed to "satisfy the 'heightened' foreseeable-harm requirement as well." *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113–14 (quoting *Dep't of Com.*, 375 F. Supp. 3d at 100). If the government files again for summary judgment, this Court will take up the issue of foreseeable harm in light of any additional evidence submitted. Accordingly, summary judgment for both parties is denied at this time. *See id.* at 114–15.

Second, this Court cannot yet determine whether the government has met its burden on segregability. While there is a presumption that an agency has complied with its segregability duties, it must still provide evidence of a "line-by-line review" as well as "that no documents

contained releasable information which could be reasonably segregated from the nonreleasable portions." *See Flyers Rts. Educ. Fund, Inc.*, 2021 WL 4206594 at *9 (quoting *Sussman*, 494 F.3d at 1117). The government provided an affidavit attesting to segregability. ECF No. 28-4. However, given this Court's conclusion that Century's confidential practice has not been sufficiently established for summary judgment, *supra* Part III.C, the government will need to supplement its segregability evidence after further review and consideration in line with this opinion. Moreover, the government might "reexamine, in light of this guidance," whether parts of the Abatement Plan Agreement should in fact be disclosed because Century would not customarily treat the information in those parts as private, or that it has not actually treated those parts as private. *See Renewable Fuels Ass'n*, 519 F. Supp. 3d at 11. In any case, summary judgment on this issue is denied at this time.

\*      \*      \*

In sum, the government has met its burden on summary judgment for the "commercial" and "obtained from a person" requirements of Exemption 4. However, the Court will deny summary judgment on (1) the confidentiality prong of Exemption 4, (2) the foreseeable harm from disclosure of the information requested, and (3) segregability of releasable and nonreleasable information.

Accordingly, the Court provides a "second chance" for the government to justify its withholding under Exemption 4 and file again for summary judgment. But, the Court does so well aware that "information has a short shelf-life within which it can be useful to the requesting party, and accordingly there may be numerous (and illegitimate) reasons why a defending agency might want to run out the clock." *See S. All. for Clean Energy*, 853 F. Supp. 2d at 78–79. This is a relatively young FOIA case and there is no evidence of bad faith, nor some painfully inadequate

attempt by the government at providing sufficient supporting materials for its invocation of Exemption 4. However, the Court expects that the government will heed the guidance in this opinion and provide appropriate evidence satisfying its burden for any information it continues to withhold. Information it cannot justify withholding under the confidentiality prong of Exemption 4, or the FOIA Improvement Act, should be promptly disclosed to OSHLP. And, if the government chooses to move for summary judgment again, the Court will of course welcome additional evidence from OSHLP demonstrating that the government cannot meet its burden.

### IV.    CONCLUSION

Based on the reasoning above, this Court will **GRANT IN PART and DENY IN PART** the Department of Labor's motion for summary judgment. The Court will **GRANT** summary judgment on the "commercial" and "obtained from a person" requirements of Exemption 4 but **DENY WITHOUT PREJUDICE** the Department of Labor's summary judgment motion as to (1) the confidentiality requirement of Exemption 4, (2) the foreseeable harm requirement under the FOIA Improvement Act, and (3) segregability. The Court will **DENY WITHOUT PREJUDICE** OSHLP's cross-motion for summary judgment.

The Court will further **ORDER** the parties to submit, within 30 days of the issuance of this opinion, a joint status report (1) informing the Court as to any decision by the government to release additional parts of the withheld record and (2) proposing a schedule to govern further proceedings in this matter.

Date: August 17, 2022

Royce C. Lamberth
United States District Judge